| 23 | 595 |
| 33 | 363 |
| 23 | 595 |
| 47 | 641 |
| 23 | 595 |
| 52 | 755 |
| 55 | 392 |

---

J. H. KIERSTEAD, PLAINTIFF IN ERROR, V. E. S. BROWN, RECEIVER, DEFENDANT IN ERROR.

Conversion: EVIDENCE. The plaintiff's cause of action was, that the defendant and one H. had taken possession of certain horses and wagon, the property of one McG., on which plaintiff held a chattel mortgage, and sold the same; the defense was a general denial. The point of contention being the identity of certain horses and wagon sold by defendant and H. with the mortgaged property, the evidence on which point was conflicting, the plaintiff offered, and the court admitted in evidence, a written offer of compromise and settlement made by him to defendant, and several letters written by defendant to plaintiff in response to such offer of settlement and compromise. *Held*, Error, and a new trial awarded.

ERROR to the district court for Madison county. Tried below before CRAWFORD, J.

*Brome, White & Mapes*, for plaintiff in error, cited: *International Railroad v. Ragsdale*, 2 S. W. R., 516. *Home Ins. Co. v. Baltimore*, 93 U. S., 527. 1 Greenleaf Ev., Sec. 192. *Edward v. Turner*, 9 Iowa, 443. *Barker v. Bushnell*, 75 Ill., 221. Wharton Ev., Sec. 1090.

*A. N. Childs* and *W. M. Robertson*, for defendant in error.

COBB, J.

The petition alleges that, on the first day of January, 1885, the plaintiff was the legal owner and entitled to the immediate possession of the following described personal property: One black horse about 11 years old, one white fore foot, weighing about 1,200 pounds; one gray horse about 12 years old, weighing about 1,300 pounds; one Whitewater wagon; each of said horses of the value of $150, and said wagon of the value of $75, which property was, at the time aforesaid, in possession of William McGuire, bailee of plaintiff; that on or about said time the defendant wrongfully and unlawfully converted the same to his own use; that the plaintiff's demand upon the defendant for possession of said property and the value thereof was refused, to the plaintiff's damage in the sum of $400, and interest from January 1, 1885, with prayer for judgment.

The defendant's answer was a general denial.

On the trial, the plaintiff offered in evidence a certified copy of the chattel mortgage from William McGuire to the Northwestern Manufacturing & Car Company of Stillwater, Minnesota, and the notes on which the mortgage was given, which, over the objections of the defend-

ant, were received in evidence. Also the deposition of Frederick L. Eichelberg. Objections were made by defendant to a portion of said depositions, which were overruled, and the depositions were received in evidence. Also the deposition of E. F. Brown, which was also admitted, over the objection of defendant to certain portions thereof.

Herman A Pasawalk was sworn for the plaintiff, and testified that he resided at Norfolk, Nebraska, was by occupation a dealer in implements and farm machinery for eight years, and agent for the sale of goods of the Northwestern Manufacturing & Car Company, and was at the time of the transactions involved in this case.

Q. Do you know anything with reference to this transaction, the giving of the mortgage and notes?

A. Yes, I made the sale.

Q. Where was the matter closed up, at your office in Norfolk?

A. Yes.

Q. You made the sale of the harvester?

A. Thresher, you mean, instead of harvester.

Q. Thresher and power?

A. Yes.

Q. Did you see the property covered by the chattel mortgage?

A. Yes, part of it. I didn't see the plow and harrows.

Q. You saw the horses, did you?

A. Yes.

Q. You are acquainted with the value of horses in the market around there, are you?

A. Yes, I was at that time.

Q. State the market value of the black horse.

A. At the time I took the mortgage I valued the horses at $300.

Defendant moved to strike the answer from the record as not being responsive. Overruled and excepted.

Q.  What were they reasonably worth at that time?

A.  What they could have been sold at?

Q.  Yes, what would have been the reasonable market value?

A.  Spot cash?

Q.  Yes, what were they worth?

A.  Well, they could have been sold at that time for $300.  I know that he hooked on to the separator and hauled it over to the yellow banks with one team, and they generally put on four horses when they haul one over there.  It takes a very good team to haul a separator over the yellow banks.

Q.  Did you see the Whitewater wagon?

A.  Yes.

Q.  What was the serviceable value of that?

A.  I should think it would be worth $40; the wagon, in my judgment, probably was four or five years old at that time.  It was in a pretty fair shape, though, the wagon was.

Q.  Do you know what has become of McGuire?  Do you know where he is?

A.  No, I don't know.

Q.  Do you know what other horses, if any, McGuire had at his place?

A.  That is all the horses he had at that time, but I think he had another black pony afterwards, that was bought at Pierce, and when he went to Battle Creek it was not paid for and they went and got it again.

The substance of the deposition of Fred. L. Eichelberg is as follows:

Q.  Are you the general sales agent of the plaintiff?

A.  Yes.

Q.  How long have you been acting in that capacity?

A.  About two and one-half months, but was engaged in the collection department of the plaintiff for about one year immediately preceding the making of the deposition now here.

Q. Do you know anything of the making and execution of a certain chattel mortgage by one Wm. McGuire to the N. W. Mfg. & Car Co., of Stillwater, Minn.

A. I know of such a mortgage being placed on file.

Q. State, if you know, whether or not the mortgage was made to secure a valid, *bona fide* debt due the company from McGuire.

A. It was.

Q. State all you know, fully, as to the making of the chattel mortgage, and the consideration therefor.

A. It was given to secure payment for a Minn. Chief separator and power. The property mortgaged was the said separator and power, two horses, one wagon, one set harness, one sulky plow, and one Marsh harvester, as I remember.

Q. State whether or not the property described in the plaintiff's petition is the same property as mentioned in the chattel mortgage executed by McGuire.

A. Yes, it is. I have examined this carefully.

Q. Where is the property now?

A. Separator and power, the last I knew of them were in the country north-east of Burnett; the balance of the property was sold by J. H. Kierstead. One Hoover took the horses, wagon, and harness to Valentine; do not know where the balance of the property is.

Q. Who took the property from McGuire's possession?

A. One Mr. Hoover levied an attachment on all the property except the separator and power, and advertised sale of same to take place at Battle Creek, Nebraska, where the property was taken; then J. H. Kierstead stopped the sale by virtue of a chattel mortgage that he held on that property, and moved the same to Burnett, Nebraska, where it was advertised and sold April 4, 1885.

Q. Do you know the defendant, J. H. Kierstead?

A. Yes.

Q. Did you ever have a conversation with him with

reference to the property described in the plaintiff's petition?

A. Yes.

Q. When and where did this conversation, or conversations, if more than one, occur?

A. In his store at Burnett, Nebraska, in May, 1885. I remember three or four such conversations.

Q. What did he say, if anything, to you about his having taken the property mentioned in the petition from McGuire's possession?

A. He told me that Hoover took out an attachment and levied on McGuire's property, and had the same taken to Battle Creek, Nebraska, leaving it in charge of the livery man or constable, do not remember exactly which. He advertised the sale to be at Battle Creek; that on the day of sale, as they were about to sell the property, J. H. Kierstead stopped the sale, with a constable or sheriff, by virtue of a mortgage he held thereon, and took the property and removed it to Burnett, where he advertised sale to take place April 4, 1885, at 1 P.M., and sold the property there in order to help us, Kierstead and Hoover, out. Mr. Hoover took the horses and wagon and harness and went with them out west of Valentine, where he was surveying, expecting to sell them at a much better price so as to help Hoover and Kierstead out on their claim. This, as near as I can remember, is what J. H. Kierstead told me in the conversation had with him in his store at Burnett during the month of May, 1885.

On the trial, before this deposition was read, defendant moved to strike out all that portion of the answer to interrogatory 12 which refers to a combination between Hoover and Kierstead to take the horses to Valentine and sell them to help the parties out. Motion overruled, with exceptions.

Q. What did you say to him, and he to you, with reference to the property?

A. In behalf of the plaintiff I demanded of Kierstead either the property or a settlement of our claim, as per my proposition dated May 23, 1885; Kierstead refused to do anything at that time, but said he would write to Hoover and they would do what was right.

Q. Has the defendant neglected and refused to return said property?

A. Yes, he has.

Q. Do you know the value of the property taken by the defendant, as described in the plaintiff's petition?

A. Yes, I have some idea of the valuation.

Q. What is the fair market value of said property, stating the value of each article separately?

On the trial the defendant objected to the interrogatory, for the reason there is no sufficient foundation laid, and that the same is incompetent, irrelevant, and immaterial.

Objection overruled, with exception.

A. I consider the cash value of the property as follows: Horses (2), each $100; wagon, $40; harness, $15; harvester, $25; sulky plow, $10.

Q. When did you first learn of the removal of this property from Pierce county, and the taking of the same by Kierstead?

A. In May, 1885.

Q. Did you in any manner or at any time consent to its removal or to its being mortgaged to or taken by the defendant?

A. I did not.

Q. After discovering that the property covered by the chattel mortgage of the N. W. Mfg. & Car Co. had been removed from Pierce county, did you make a personal investigation with reference to its removal?

A. Yes, I did.

Q. What did you learn in reference to it? State fully all you know about it?

A. After investigating I learned that one Hoover

levied an attachment on the property, and advertised sale of same to take place at Battle Creek, Neb. Then J. H. Kierstead stopped the sale, so he told me, by a chattel mortgage that he held on the property, and moved the same to Burnett, Neb., where it was advertised and sold, April 4, 1885, at 1 P.M., as shown by his advertisement in the county paper.

The plaintiff also offered his own testimony as follows:

Q. Are you the plaintiff in this action?

A. Yes, I am, as receiver of the Northwestern Manufacturing and Car Company.

Q. When and by whom were you appointed receiver at Stillwater, Minn.?

On the trial the defendant objected to this question as being incompetent, irrelevant, immaterial, and not the best evidence. Objection overruled.

A. On May 10, 1884, in proceedings then pending in the district court of Washington county, Minn., I was, by an order of said court, duly appointed receiver of said N. W. Mfg. and Car Co.

Q. Did you accept such appointment and qualify as receiver by filing a bond?

On the trial this interrogatory was objected to as to that last above. Overruled, with exceptions as above.

A. Yes, I did; I at once, on said May 10, 1884, took possession of the property of said N. W. Mfg. and Car Co., and subsequently, on May 12, 1884, filed a bond in $50,000, which bond, with the sureties, was duly approved by the district court of Washington county, Minn.

Q. Did you then enter upon the discharge of the duties of said receivership, and take possession of the business and effects of said N. W. Mfg. and Car Co.?

A. I did.

Q. Have you been since said date, and are you now, acting as such receiver?

A. Yes, sir; I am.

Q. Do you know anything about a chattel mortgage that was given to the N. W. Mfg. and Car Co. by Wm. McGuire, on July 30, 1883?

A. I do.

Q. What was the consideration of the giving of that mortgage by said McGuire?

A. On July 30, 1883, the N. W. Mfg. and Car Co. sold and delivered to Wm. McGuire a separator and Woodbury power, and said McGuire, on said day, executed and delivered to the said N. W. Mfg. and Car Co., for said machinery, one note for $210, due January 1, 1886; one note for $220, due January 1, 1885; one note for $235, due January 1, 1884; and he secured said notes by giving a chattel mortgage on the said machinery, and also on 1 black horse, 9 years old, 1 white forefoot, weighing 1,200 pounds; 1 gray horse, 10 years old, weighing 1,300 pounds; 1 set double harness, 1 Whitewater wagon, 1 Marsh harvester, 1 Gilpin sulky plow. This mortgage was given to secure a valid and bona fide debt then and there due said N. W. Mfg. and Car Co. from the said McGuire.

Q. What became of the property covered by this mortgage?

A. The horses were removed from Pierce county, without my knowledge and consent, some time last year.

Q. State all you know about the defendant taking the chattel property described in the complaint?

A. About May 25, 1885, I learned the defendant had taken a second mortgage on the property described in the complaint, and that the same had been sold under his mortgage and removed from Pierce county. That was the first time I knew about it. I had no knowledge of the existence of that mortgage until after the horses had been sold and taken away. I did not consent in any manner to the removal of the property out of Pierce county, or to the taking of the mortgage thereon by the defendant, J. H. Kierstead.

Q.   What steps, if any, did you take for the recovery of your property?

A.   My agent, Mr. Eichelberg, at once called upon Mr. Kierstead and requested the return of the property, or its value, and submitted certain propositions to him for the settlement of the matter.   Later on, the same year, J. E. Smith, one of my agents, called on Mr. Kierstead to effect a settlement with him, but did not succeed.   I afterwards placed the matter for settlement in the hands of my attorney, Mr. M. A. Rainbolt, with instructions to take the necessary steps to recover the value of the property sold.

On the trial the defendant objected to what witness said Mr. Eichelberg said and did, *i.e.*, the above interrogatory and the answer thereto, and moved to strike the same from the record, as being incompetent, irrelevant, immaterial, and hearsay, which motion and objection were overruled, with exceptions.

Q.   Have you had any correspondence with defendant with reference to the taking of such property?

A.   Yes, I have; but the letters from him I sent to Mr. Eichelberg, my agent in Nebraska, and he has not returned them.

Q.   What part of the mortgage debt, if any, has been paid?

A.   The note for $236, due January 1, 1884, has been paid in full, and on the note for $220, due January 1, 1885, there has been paid only $3.20.   Nothing has been paid on the note for $210, due January 1, 1886.

Q.   For what purpose were these notes taken?

A.   The notes were taken by the said N. W. Mfg. and Car Co. in the usual course of business, in good faith, and not with any intent to hinder, delay, or defraud purchasers, and were taken for the property described in one of my previous answers.

The plaintiff having rested his case, the defendant, on his own behalf, testified that he was not acquainted with

the plaintiff, Mr. Brown; had seen M. F. Eichelberg three or four times, all on the same day; does not think he ever sold the property described in the plaintiff's mortgage; that he has heard the testimony as read from the deposition of Mr. Eichelberg; that he never admitted to Eichelberg' that he had sold any of the property covered by the mortgage; that the sale that Mr. Eichelberg alluded to as sold by witness was a sale made under foreclosure of mortgage by McGuire to witness; that the black horse mentioned in that mortgage, and sold by witness, did not have one white hind foot.  Witness cannot say positively as to the age of the black horse sold by him; should think he was 12 or 14, perhaps 15, years old, pretty well along in years, and pretty well stiffened up; think he would weigh 1,000 pounds.  Witness is somewhat acquainted with the value of horses at that time and place; thinks said horse was worth from $50 to $60.  He also sold a gray horse, thinks about the same age, pretty well along in years; thinks the horse worth $75 or $80, perhaps.  He also sold an old wagon that had no name on it to distinguish the maker; the wagon had been used a long time, from its appearance.

On cross-examination the defendant testified:

Q.  You have had considerable correspondence with the agents of this company, have you not, with reference to this property, and the sale of it?

A.  Some, yes.

[Here counsel handed a letter to the witness.]

Q.  Did you write that letter to S. F. Brown?

A.  I think I did; yes.

Q.  And this one marked 2?

A.  I did.

Q.  And this one marked 3?

A.  I did.

Q.  And this one marked 4?

A.  Yes.

Q.   At this time Mr. Brown was claiming that you had sold these horses and the wagon, and was claiming a settlement from you, or the pay for them, or the return of them?

A.   I never had any conversation or talk with him.

Q.   I ask you if these letters were not in response to him, claiming that you had sold these horses and the wagon, and it was in reference to that claim that these letters were written?

A.   They were written in response to a proposition that Mr. Eichelberg made me.

Q.   The agent of the company?

A.   Yes.

Q.   Mr. Eichelberg was claiming, or had claimed, that you had sold these horses, and that you had also sold the wagon?

A.   Yes; that is correct.

Q.   Do you find any claim in any of these letters where you claimed that you didn't do that—deny that you sold the property?

The defendant's objection to the above question was sustained by the court.

Q.   You don't find anything in there?

A.   Where?

Q.   I asked you if you ever claimed in any of these letters that you did not sell the property that they claimed you sold?

A.   I think not.

Q.   This is the first time that you disclaimed that fact?

A.   No, sir.   I would state though—

Q.   I don't want you to state anything only what you are asked?

A.   All right, sir.

Q.   Please identify that letter that is marked 5?

A.   That is mine.

Q.   Did you ever see this paper, or a copy of it?   ·

[Here counsel hands a paper to the witness.]

A. I think I had a copy of it.

Q. You had a copy of it?

A. I think so, something similar to that; I don't know whether it is the same, or not.

[Here the last above-mentioned paper is identified as No. 6.]

Robert Ward and William Ward were respectively sworn and examined as witnesses for the defendant. They testify that they are each acquainted with the property sold by the defendant on his mortgage from McGuire, and each substantially corroborates the evidence given by defendant as to the description and value of the horses and wagon.

The defendant being recalled and re-examined on his own behalf, stated that he did not deny in the letter written to plaintiff's agent that he sold the property on which plaintiff held the mortgage, for the reason that, in his conversation with Mr. Eichelberg, prior to the writing of any letter, he denied it then. "I did that the first time that I saw him, *i.e.*, I denied selling the property that they claimed to have been covered by the mortgage."

The defendant having rested, the witness H. A. Pasawalk was recalled, and testified that he was acquainted with McGuire; that at the time plaintiff's mortgage was given he lived in Pierce county, on a timber claim near Burnett; "that at the time of giving the mortgage the property was on the claim; after he bought the property I never saw it any more; really I saw the property right there in Norfolk; he had it there." Witness heard the witnesses here describe the black horse that they say was sold by defendant, and, as near as he could see, it tallied with the same team that was mortgaged, only the horses were run down so that they were not worth so much.

Counsel for plaintiff here offered the proposition in evidence which has heretofore been identified and marked "O."

[Defendant objected as being incompetent and immaterial and not proper rebuttal.] Objection overruled with exception. Whereupon the above offered document was admitted by the court.

Counsel for the plaintiff then offered in evidence the several letters marked 2, 3, 4, and 7, heretofore identified. Defendant objects as being incompetent, irrelevant, and improper rebuttal evidence. Objection overruled and exception taken. Whereupon the above offered letters were admitted in evidence. Hereupon counsel for plaintiff offered in evidence a letter marked 5, which has been heretofore identified. The defendant objected to the admission of said letter in evidence, on the ground that the same is incompetent, irrelevant, immaterial, and improper rebuttal evidence, which letter was admitted in evidence, marked exhibit 5.

There was a verdict for the plaintiff in the sum of $132.10. The defendant's motion for a new trial having been overruled, judgment thereon was entered for the plaintiff. The defendant brings the cause to this court on error.

There are numerous errors assigned, but our examination will be confined to the fourth, fifth, and sixth, which are directed to the admission in evidence, by the court, of the proposition made by the plaintiff's agent to the defendant, attached to the record and marked exhibit 6, and, the several letters written by the defendant to the said agent, and another agent of the plaintiff, also attached to the record, and marked respectively 2, 3, 4, 5, and 7.

The proposition marked 6 is as follows:

"NORFOLK, NEB., May 23, 1885.
"Mr. J. H. Kierstead, Burnett, Neb.:

"DEAR SIR—Below find the proposition I wish to offer and release you from all responsibility in the William McGuire mortgage property sale, if accepted on either of these below:

"1. I will take $225 for our claim in the mortgage property sold, and release you.

"2. I will take $485 for the entire McGuire claim, and turn over to you the separator and power notes and mortgage, and release you from the property sold by you, subject to our mortgage.

"3. I will take $175 for the property sold, *provided,* you will pay all expenses, and time spent in looking up this matter, and also for the use of the property and horses.

"4. I will get the property and dispose of it, but shall expect you to pay for whatever expense I have been to, and for the use of the property, which we would expect in either of the above. Examine the above and advise me by Wednesday, at Lincoln, what you propose to do.

"F. L. EICHELBERG, <em>Collector.</em>"

To this proposition and other letters written by agents of the plaintiff to defendant, but which were not offered in evidence, the following letters were written by the defendant:

"No. 2.     BURNETT, NEB., June 14, 1885.
"*F. L. Eichelberg:*

"DEAR SIR—Yours of the 13th at hand. I have written you three letters. In my last I stated that I thought your propositions were not fair to me, as you want me to pay a large proportion of your claim. To do so, I would be obliged to pay it out of my own pocket, which I think is not right. I have not heard from Hoover yet; I think the matter could be satisfactorily adjusted if fairly entered into. Respectfully,

"J. H. KIERSTEAD."

"No. 3.     BURNETT, NEB., May 24, 1885.
"*Fred. L. Eichelberg, Lincoln, Neb.:*

"DEAR SIR—Yours from Norfolk, with proposition for settlement, at hand last Monday, and I answer by your request. I wrote you last Monday, as per agreement. I

also wrote Mr. Hoover on the same day. He is the gentle-man that was interested in the property at issue. Your demands seem rather heavy on me. If I get anything out of the property for my claim, it will be not to exceed $130, with costs on horses account, about $30, leaving me about $100, which I think is pretty light money for my account there; if I have to pay you this money back, with an additional $125, it comes pretty heavy on me on an honest deal; I have written Hoover a statement of the facts as lain down by you to me, asking him what he proposes to do. Will get a letter from him this week; will then write you again. Hoping this will prove satisfactory, and that the business may be amicably adjusted, I am, yours respectfully,

"J. H. KIERSTEAD."

"No. 4.        BURNETT, NEB., June 1, 1885.
"F. L. Eichelberg:

"DEAR SIR—I did not hear from Mr. Hoover directly in regard to our mortgage business last week, but un-doubtedly will within a day or two, when I will write immediately. If I do not hear, will write you any way, and see if we cannot fix the matter up, ourselves, agree-ably. You will hear from me again in a day or two. Respectfully yours,

"J. H. KIERSTEAD."

"No. 7.        BURNETT, NEB., June 25, 1885.
"F. L. Eichelberg:

"DEAR SIR—Yours of the 22d at hand by yesterday's, Wednesday's, mail with request to answer by Wednesday. I cannot do that, but will come as near it as I can. I have been talking, since I wrote, to one Lewis, here, in regard to buying machine, one, I think, you talked with, and he told me he would pay you what you asked for the machine. So much for your benefit. As regards the proposition made me by you, I answered sometime since that I did not think it was in justice to me, and I could not accept either

of them.   What I can do that would be fair and right I am willing to do.   More than that, I think, is not right to ask.   Hoping the matter may be amicably adjusted, I am, respectfully yours,

"J. H. KIERSTEAD."

"No. 5.          BURNETT, NEB., Sept. 7, 1885. "F. E. Smith, Norfolk, Neb.:

"DEAR SIR—I am quite unwell this morning and will not be able to get to Norfolk.   I will say, however, that I will be down and see Mr. Rainbolt soon.   My judgment tells me that I ought not to pay the money you demand in settlement of that McGuire claim.   I shall have to let you take what steps you think right, until I can look into the matter, which I will do as soon as possible.   If you think it advisable to begin suit, do so.   Shall not feel hard towards you for doing it.   Respectfully,

"J. H. KIERSTEAD."

These papers were introduced by the plaintiff, and received in evidence over the objections of the defendant. The controversy was mainly upon the identity of the property sold by the defendant and one Hoover with the property covered by the mortgage of the plaintiff.   The theory upon which these letters were admitted in evidence seems to have been that, as the defendant nowhere in the course of this controversy denied that the property sold by him and Hoover was the same as that claimed by the plaintiff under the mortgage to the Manufacturing and Car Company, it was constructively an admission that it was the same property.   There are three facts, and three only, proved by the said correspondence: 1, That the plaintiff submitted to the defendant four alternative offers of compromise; 2, That the defendant entertained said offers; and 3, That he finally declined to accept either of them.   The letters of the defendant nowhere contain an implied admission of liability.   If they did, the letters

having been written in response to the plaintiff's proposition for a compromise of a disputed claim about to be put in litigation, such letters were not admissible in evidence to prove such admission. Such is the doctrine of the text-books and cases cited by counsel for the plaintiff in error.

Wharton, in his Law of Evidence, Vol. 2, Sec. 1090, says: "An implied admission of liability made as part of the negotiations for a compromise, expressly for the purpose of peace (whether or no such admission be made under the technical provision 'without prejudice'), will not be received in evidence against the party by whom it is made, when its object was merely to suggest a scheme of settlement. The policy of the law favors amicable settlements of litigation, and therefore protects negotiations *bona fide* made for the purpose of effecting such settlements. Aside from the reason just mentioned, it may be well argued that where the communication is made because the party is ready to offer a sacrifice for the sake of peace, this cannot be regarded as the admission of a right in the other side." To this law the author cites thirty-eight English and American cases, all of which seem to sustain it.

But the precise question here is, whether the silence of a party, where a proposition for settlement and compromise has been made to him by his opponent, can be construed into an admission of some fact deemed necessary to maintain his opponent's case. While I am unable to find an authority to this proposition, I think that it cannot. Indeed, I doubt that the action of any court has theretofore called for a discussion of this question.

But further, it does not appear that the proposition made by the plaintiff presents any fact, the admission of which would tend to establish the plaintiff's cause of action.

The evidence in the case, aside from the proposition and letters, is quite conflicting. A verdict rendered upon it alone, for either party, without the intervention of error

in the proceedings, would probably stand. It is therefore probable that the result turned upon the evidence, or supposed evidence, of these letters.

The said letters having been erroneously admitted in evidence, and such error being prejudicial to the plaintiff in error, there must be a new trial. The judgment of the district court is therefore reversed, and the cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

The other judges concur.