Bishop Cafeteria Company of Omaha, a Nebraska Corporation, et al., Appellees and Cross-Appellants, v. Barton H. Ford, Appellant and Cross-Appellee.

129 N. W. 2d 581

Filed July 17, 1964.   No. 35698.

McCormack, McCormack & Brown, Boland, Mullin, Walsh & Cooney, A. Lee Bloomingdale, and Rodney Shkolnick, for appellant.

Eisenstatt, Lay, Higgins & Miller, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

The plaintiffs, Bishop Cafeteria Company of Omaha, a Nebraska Corporation, and Bishop-Stoddard Cafeteria Company, an Iowa corporation, lessees of the premises involved, brought this action at law in the district court for Douglas County, Nebraska, against the defendant, Barton H. Ford, the lessor, to recover a judgment in the amount of $132,000.

The plaintiffs base their claim on the termination of a lease by the defendant pursuant to a written cancellation clause in the original lease. This clause, which is hereinafter set forth, provided the lessor might cancel the lease in which event he was to pay the sum of $1,500 a month for the unused portion of the term which originally expired June 30, 1963, but which was extended to June 30, 1968. The plaintiffs claim they are entitled to $1,500 a month for 88 months from March 1, 1960, to and including June 30, 1968, the day of the expiration of the extended term.

The defendant answered admitting liability under the cancellation clause of the lease but only to the extent of $42,000 representing $1,500 a month for 28 months from March 1, 1960, to and including June 30, 1963, the date of the expiration of the term in the original lease. Defendant also pleaded a set-off arising from his claim of the nonpayment by the plaintiffs of a 5 percent percentage on the gross receipts of the lessees' business for the fractional year during which the cancellation occurred on which he claimed $8,281.92 due and unpaid.

Subsequent to the stipulation, both parties filed cross-motions for summary judgment. The trial court granted the plaintiffs' motion and entered judgment in favor of the plaintiffs in the amount of $123,718.08, representing the full amount prayed for in the plaintiffs' petition of $132,000, less the sum of $8,281.92, representing the full amount claimed in the defendant's set-off.

The defendant filed several motions to set aside and vacate the order and judgment of the trial court and enter an order and judgment sustaining the defendant's cross-motion for a summary judgment or in the alternative to grant a new trial. The cross-motion for summary judgment and the motions for new trial were overruled by the trial court and the defendant has thereafter brought the matter to this court by an appeal. The plaintiffs have cross-appealed as to the allowance of the defendant's set-off.

The defendant assigns error to the trial court: In overruling the defendant's motion for a summary judgment; in sustaining the plaintiffs' motion for a summary judgment and entering judgment thereon; in overruling the defendant's motion to set aside and vacate the judgment entered by the trial court on the plaintiffs' motion; in failing to set aside the judgment for the plaintiffs and enter one prayed for by the defendant or to grant a new trial; and in excluding all of the testimony of each of the witnesses John R. McCormack and Robert J. Reinders offered at the time of the hearing on the motion to set aside the summary judgment or grant a new trial and at that time excluding the defendant's exhibits numbered 1, 2, 3, 4, 5, 6, 7, and 10, the assignments of error in respect thereto being made severally.

All of the material facts at the time of the entry of the summary judgment are admitted either by judicial admissions or by stipulation of fact except the affidavit of Cyril L. Kegler, president of each of the plaintiff corporations, which was admitted in evidence at the

time of the plaintiffs' motion for summary judgment. The purpose of the affidavit was to show that the plaintiffs, relying on the last extension of the lease, made extensive improvements on the demised premises and on cancellation were put to great expense in moving and attempting to induce their old customers to patronize them at their new location.

The uncontroverted facts are that on or about March 15, 1948, the plaintiff, Bishop-Stoddard Cafeteria Company, as lessee, and the Redick Corporation, as lessor, entered into a lease agreement involving premises in the city of Omaha, Nebraska, which were to be used for restaurant and cafeteria purposes. The lease was for a term of 5 years beginning July 1, 1948, and ending June 30, 1953. By a rider attached thereto, the original lease gave to the lessee and lessor, and each of them, an option to extend the lease for an additional term of 10 years from July 1, 1953, to June 30, 1963, by giving notice of the extension during the months of April, May, or June 1953. Immediately following the provisions in the lease which granted the option to extend the lease is a cancellation clause which provides as follows:

"It is further understood and agreed that in the event the above option is exercised by either party and the Lessor makes a bona fide sale, or a long time lease for a term of 50 years or longer, of the building of which the leased premises are a part, then the Lessor may at any time after July 1, 1959, upon giving to the Lessee at least One (1) years' advance notice in writing of the Lessor's intention to terminate this lease, terminate the same; provided that in such case the Lessor shall pay to the Lessee the sum of $1,500.00 for each and every cancelled month, commencing with the effective date of termination or the date said premises are surrendered, whichever is later, and ending with the month of June 1963."

Under date of September 21, 1950, a written amend-

ment to the lease was entered into and signed by the then lessor and lessee by which it was agreed that the option provision be modified to the extent of permitting the lessee to exercise its option to extend the same at any time subsequent to September 15, 1950, and which stipulated that all other terms and conditions of the lease and rider were to remain in full force and effect.

On September 25, 1950, the plaintiff, Bishop-Stoddard Cafeteria Company, exercised its option granted in the amendment to extend the original lease for an additional 10 years from July 1, 1953, to June 30, 1963.

On June 28, 1951, the lessor, Redick Corporation, dissolved and on dissolution conveyed the real estate which had been demised together with all rights of the lease to the stockholders of the corporation.

Subsequently, plaintiff, Bishop-Stoddard Cafeteria Company, caused the formation of Bishop Cafeteria Company of Omaha, a Nebraska corporation, as its wholly owned subsidiary to carry on the restaurant and cafeteria business in Omaha, and on July 2, 1956, by a written assignment duly accepted by the then owners of the property, assigned all its rights and interest in the lease to the new corporation by which assignment both of the plaintiff corporations were liable for the payment of the rents.

On July 25, 1958, the plaintiffs, Bishop-Stoddard Cafeteria and Bishop Cafeteria Company of Omaha, entered into a second written extension of the lease with the then owners of the premises which provided:

"In consideration of the sum of One Dollar ($1.00) by each of the undersigned parties to the other in hand paid, the receipt whereof is hereby acknowledged, it is hereby mutually understood and agreed that the lease dated March 15, 1948 and of the amendment to the lease dated September 21, 1950, and of the option exercised on September 25, 1950 to extend the lease for the additional ten year period specified, ending June 30, 1963, between the Redick Corporation, a Ne-

braska Corporation as Lessor, and the Bishop-Stoddard Cafeteria Company, an Iowa Corporation as Lessee, and assigned to the Bishop Cafeteria Company of Omaha on July 2, 1956, covering the store room and basement space thereunder * * * is hereby extended *under the same terms, covenants, and conditions therein expressed and at the same rental for the further term or period of five (5) years from July 1, 1963 and ending on the 30th day of June, 1968.*" (Italics supplied.)

On November 25, 1959, the then owners of the premises conveyed the demised premises to Barton H. Ford, the defendant herein, by special warranty deed, "subject to existing leases, tenancies, and occupancies."

On February 29, 1960, the defendant through his agents gave notice to the plaintiff, Bishop-Stoddard Cafeteria Company, that the lease was terminated as of February 28, 1961, pursuant to which notice the plaintiffs vacated the premises on February 28, 1961.

There were additional agreed facts which are applicable to the cross-appeal of the plaintiffs which will be set forth when the issues with respect thereto are considered.

The defendant first assigns error to the trial court in sustaining the plaintiffs' motion for a summary judgment and entering judgment thereon, and in overruling the defendant's motion for summary judgment or in the alternative for a new trial. These assigned errors require that they be considered together.

We will first consider the construction to be placed upon the contract of the parties by the lease and the extensions thereof.

The extension for the last 5 years was by a separate instrument signed by the lessor and lessee and dated July 25, 1958. The pertinent portion was heretofore set out. It is termed an amendment to the lease. It refers to the original lease and its prior extension, and the previous assignment from the original lessee to the Bishop Cafeteria Company of Omaha. It provides that

the lease is thereby extended, "under the same terms, covenants, and conditions therein expressed and at the same rental for the further term or period of five (5) years from July 1, 1963 and ending on the 30th day of June 1968." This provision is in no way uncertain or ambiguous.

Although in view of this express agreement it becomes unnecessary to state the general law pertaining to such situation with respect to the case before us, it may be mentioned to explain the cases hereafter to be discussed in some of which the rule has been applied. "Where the covenant for a renewal is general and does not state the terms of the renewal lease, the new lease is to be upon the same general terms and conditions as the old lease, which are applicable to the renewal period. This rule is subject to the exception, however, that under a general covenant to renew, the lessee is not entitled to have inserted in the renewal lease a covenant for a further renewal." 32 Am. Jur., Landlord and Tenant, § 959, p. 807.

The plaintiffs contend that under the express agreement, which here corresponds with the rule of law cited, that on the extension of the term the provision of the original lease requiring the defendant to pay $1,500 a month was extended and made applicable throughout the canceled term. It is not surprising that cases construing exactly, similar, or even very close to the lease and extension agreement in suit have not been found either by counsel or by us on investigation. However, there are cases applying the general rule, which in the present case was adopted by the express agreement of the parties, that throw light upon our problem and we believe are of controlling significance.

Our own court in applying the general rule to the factual situation in the absence of an express agreement considered the effect of an extension on the conditions of the original lease in Pankonin v. Gorder, 97 Neb. 337, 149 N. W. 811. The facts in that case were:

A partnership of which the defendant was a member sold a certain harness and related business to the plaintiffs and at the same time entered into a lease of its property with the purchaser for 5 years with an option to renew for a period of 1 year or more, up to 5 years. A sales contract and two lease agreements were construed together as the sale and lease agreement. The executed lease recited: " 'Also in consideration of the covenants and agreements hereinafter specified to be done and performed by second party, first party agrees to, and hereby does, sell and assign to second party his good will in the business of general harness store and implement store, * * * located on said property; and agrees not to engage in the same business in the village of Louisville, during the continuance of this lease. In consideration of the leasing of said premises from said first party, and of the agreement on the part of the first party to remain out of the general harness and implement business in the village of Louisville as above specified during the term of this lease, second party hereby agrees with the first party to pay said first party the sum of twenty-two ($22) dollars per month, payable monthly in advance. It is further stipulated and agreed between the parties that in case first party, at any time during the period of this lease, carries on or engages in the general harness and implement business such as he is selling to second party, that second party is to have the use of said buildings from such time until the expiration of this lease free of charge without the payment of any rent. It is further mutually understood and agreed between the parties hereto that, at the expiration of the term of this lease, second party has the option of leasing said buildings for a period of one year or more up to five years for the same consideration, and upon the same terms and conditions as are in this lease named.' "

The lease was extended pursuant to its terms. The defendant went into a competitive business during the

period of the extension in violation of the above provision in the original lease. The court in the cited case held that the extension extended the provisions of the old lease and the provisions concerning the entering into a competitive business had been violated. That under the conditions of the old lease, when the defendant went into business competing with the plaintiff, the plaintiff need pay no further rent whatever. It becomes apparent that the provisions respecting the agreement to stay out of the business in the cited case, although they referred to the original term in the lease itself, were made applicable to the extended term and governed it also.

The case of Ogden v. Garrison, 82 Neb. 302, 117 N. W. 714, 17 L. R. A. N. S. 1135, although it was quite different, indicates that in certain instances the tenant by executing a new lease will not lose his rights that the law gave him under the old. The principal reason for discussing it, however, is that the opinion of the court therein throws clearly in relief the problem before us. In that case a tenant during his previous term erected buildings which were trade fixtures which he might remove. He renewed his term by a new lease which provided: " 'The party of the second part (defendant) will carefully protect all buildings, fences and improvements of every kind that are now on said premises, or that may be erected thereon during the continuance of this lease; that he will promptly at the expiration of the term herein granted yield up possession of said premises in as good repair as they now are or may be at any time during the continuance of this lease, ordinary wear and loss by fire excepted.' " The court discussed the then existing decisions of other courts, some of which held that under an extension his rights would be preserved but not so when a renewal took place because the tenant had thereby surrendered his previous term. However, this court said the latter rule would not be followed and it made no difference because the tenant

had stayed in possession. His occupancy was notice to the purchaser from the landlord and the tenant could remove his buildings as against the subsequent purchaser as provided in the original lease. This court there said: "Nothing appears in the renewal lease indicating an intention to give the buildings in controversy to the landlord. * * * It is not sound reasoning to hold, under the evidence of this case, that the defendant intended to make a present to the landlord. He erected the buildings. They were his property. He never received anything for them. It is difficult to see how the renewal lease, which may better be termed an extension lease, in which defendant agreed to protect the plaintiffs' buildings, can operate as a transfer of the defendant's chattels to plaintiffs' grantor. It would seem better reasoning to hold that the renewal lease was intended by the landlord as an extension of the time in which the defendant was privileged to avail himself of all the rights secured to him by the tenancy."

The lease in the present case from the facts herein related was property in the hands of the lessee. The rent charged and the cancellation payments to be exacted on termination show plainly it is valuable property. The defendant concedes that he owes $1,500 a month for the cancellation of the previous term. He contends he should receive the extended term from July 1, 1963, to June 30, 1968, for nothing. If as in Ogden v. Garrison, *supra,* it was difficult to discover any logic or equity which could be invoked to support the rationale of the rule of law urged, how can it now be asserted or implied that the parties intended on the extension of the term for 5 years that the extended term had no value and was subject to be canceled on payment of $1,500 a month for the previous term only. If it were so canceled in May 1963, the whole 5 years could be canceled for such sum.

Although other cases of this court appear to be lacking, there are several cases from courts of last

resort in other jurisdictions that are pertinent in varying respects to our problem.

Lavielle v. Erpeldinger's Executors, 218 Ky. 24, 290 S. W. 1040, was a case where the original lease was for 15 years with a privilege of 5 years extension. It had a provision that the lessee was to pay all the city, state, and county taxes and other assessments levied: " 'such taxes and assessments to be paid by the lessee for not more than 15 years in all, if this lease shall continue in force only that long, and in no event for more than twenty years in all, if this lease shall be extended and continue in force for twenty years.' " After the 20 years it was extended by an agreement containing the following: " 'it is expressly understood and agreed that said original lease dated the 8th day of September, 1903, shall be and remain in full force and effect, except only as the same is modified and altered by this agreement.' " It had no express provisions in regard to taxes. The lessor as plaintiff sued to collect the taxes for the extended term and the trial court sustained a demurrer to his petition. The appellate court, in reversing the judgment of the trial court, held: "Where original contract of lease provided for payment of taxes by lessee, and subsequent extension contract expressly provided that original contract should remain in effect as modified, lessee is liable for taxes, although no reference was made thereto in extension contract."

Some question arose as to the construction the parties placed on the lease as the lessee had paid the 1924 taxes without comment. The court said: "It is clear that in the original contract it was intended for the lessee to be liable for the taxes during the period of the lease, which in that instrument was limited to twenty years, and the quoted phrase merely emphasized the idea that this liability would not extend beyond the life of the lease. By leaving that provision unchanged in the extension contract, it is equally clear that the parties intended for the lessee to pay such taxes during

the life of the extension lease. This is somewhat strengthened by the contemporaneous construction given to the contract by the parties themselves, as it appears that Mr. Erpeldinger paid the 1924 taxes without comment. It is argued, however, that this arose from a change in the assessment period and that the 1924 payment was in the discharge of the 1923 taxes. This point is not made clear; but leaving out the question of the 1924 payment of taxes we think such is the proper construction of the contracts."

The case of Gostin v. Needle, 185 Md. 634, 45 A. 2d 772, 163 A. L. R. 1013, involved a lease to the county commissioners which contained the following provision: " 'Should The Landlords at any time during the term of this lease sell or agree to sell the property known as Number 1433 Pennsylvania Avenue, Baltimore, Maryland, and thereby desire possession thereof, the said Tenant hereby agrees to vacate, quit and surrender the said premises within sixty (60) days from the date of such notice to him of the Landlords' or purchaser's desire to regain possession, and upon such surrender in accordance with the terms of this lease, the said Tenant shall receive the sum of one thousand dollars ($1,000.00) as liquidated damages.' " At the close of the term the tenant held over and remained in possession with the defendant's consent, "subject to the said rent," and was in possession when he was notified that the property had been sold and the purchaser desired possession within 60 days. The tenant vacated and brought suit for the thousand dollars.

The court held: "Where the lessee, after the expiration of a three-year lease, which contained no provision for renewal or extension, or holding over, held over, with the consent of the lessor, a tenancy from year to year, beginning at the end of the tenancy for years, arose by agreement of the parties.

"Where a tenant for years holds over, except that the tenancy is for one year, renewable indefinitely, he im-

pliedly holds subject to all covenants in the lease which are applicable to the new situation.

"Whether a particular clause in an original lease is applicable to the new situation arising on the tenant's holding over, depends, not upon the mere wording of the clause or whether the clause is 'usual and ordinary'; but upon the nature of the clause, i.e., whether the 'new situation' is sufficiently similar to the original situation to warrant the inference that the clause is one of the implied terms of the new tenancy." The cited case was sent back for trial, however, because the petition to which a demurrer had been sustained did not allege clearly the notice was given on behalf of the landlord.

In Grummer v. Price, 101 Ark. 611, 143 S. W. 95, it was said: "A lease executed January 11, 1900, also provided that the lessor agreed that, should the lessee pay to him the sum of $220 with 10 per cent. interest and all taxes legally assessed against the land for the year on or before October 15, 1900, and also the further sum of $225, with interest from date until paid, all taxes assessed, on or before October 15, 1901, then, when the two payments have been made as provided, the lessor 'will sell said lands to' the lessee 'with good and sufficient deed, but it is distinctly understood * * * that there shall be no sale of said lands until said $445 together with interest thereon and all taxes legally assessed * * * during this term of lease has been fully paid, * * * and until then the above mentioned lease shall be solely in force.'" It was therein held that the instrument was a lease, with an option to purchase, and further that: "An indorsement by the owner on a lease, containing an option to purchase, 'extended within contract until' the date named, extends the whole contract, including the option to purchase, so as to operate as a new contract from the date of the extension, and hence the lessee was not entitled to a credit on the purchase price of the rent paid from year to year prior to his

election to exercise the option after the date of such extension. * * *

"If time was of the essence of an option to purchase land, the provision as to time was waived by an extension of the option."

Much the same result concerning an extension of a lease containing an option to purchase was reached by the court in Balsham v. Koffler, 8 N. J. Super. 48, 73 A. 2d 272.

The cases hitherto cited were determined under varying circumstances. In some instances they were decided on demurrers to a petition or with respect to motions for judgment on the pleadings or at the close of the evidence. The defendant in the case before us urges that the present case is an appeal from a summary judgment and calls attention to the rules of this court in such a situation. Those rules are set forth in Berg v. Rasmuss, 176 Neb. 340, 125 N. W. 2d 905, along with many other cases set out in the defendant's brief, as follows: "In considering a motion for summary judgment the courts should view the evidence in the light most favorable to the party against whom it is directed, giving to that party the benefit of all favorable inferences that may reasonably be drawn therefrom.

"The purpose of the summary judgment procedure is not to require a plaintiff to reveal in detail the evidence he expects to produce to prove the allegations of his petition. * * *

"A motion for summary judgment is not a substitute for a demurrer, a motion to dismiss, or a motion for judgment on the pleadings. * * *

"The evidence offered on a motion for summary judgment is for the purpose of showing that no issue of fact exists, not to try issues on pleadings, depositions, and affidavits which constitute only a part of the evidence available on a trial on the merits.

"In order for the movant to obtain a summary judgment it must be shown first, that there is no genuine

issue as to any material fact in the case and, second, that movant is entitled to judgment as a matter of law."

The defendant urges that in the present case the trial court had no right to enter summary judgment on the plaintiffs' motion therefor. A review of the pleadings and the stipulation of facts, however, shows clearly that there is no dispute as to the essential facts. All facts set forth in the petition were admitted either by judicial admissions in the answer or by the stipulation of the parties. The express contention of the defendant is apparent. He maintains the contract in the present case is ambiguous and that he should be allowed to introduce evidence concerning the action of the parties to show their interpretation of it. The defendant cites certain cases where courts have held the contract under consideration ambiguous. The courts there held when it is established that a contract is ambiguous, the meaning of its terms is a matter of fact to be determined in the same manner as other questions of fact which preclude summary judgment. He cites among other cases, Severson v. Fleck, 251 F. 2d 920. A reading of that case clearly shows that the contract included clauses that were diametrically opposed to each other as to the commission of the broker who brought the action. In such a case this rule is applicable. This opinion cannot be unduly extended to discuss the other cases cited which we deem inapplicable also.

Without quarreling with this rule, it may be said we do not think it has application in the present case. The defendant points out no ambiguity in the lease or the extensions before us in the present case. He contends instead that the contract should be interpreted differently than the construction placed upon it by the trial court.

In the case of Master Laboratories, Inc. v. Chesnut, 157 Neb. 317, 59 N. W. 2d 571, this court said: " ' "* * * where a written contract, signed by both parties, is complete in itself, and contains and expresses the mutual

covenants and promises of both, without ambiguity or apparent omission; where the statement of the consideration therein is of a contractual nature, and not a mere acknowledgment of receipt, parol evidence is not admissible to contradict, vary or add to the consideration expressed in the instrument itself." ' See, also, Spiegal & Son v. Alpirn, 107 Neb. 233, 185 N. W. 415."

A contract is not ambiguous within that sense merely because it may be difficult to construe. The construction of a contract, if needed, being a question of law for the court as well as a duty that rests upon the court, there can be no ambiguity within the rule to which we have referred unless and until an application of the pertinent rules of interpretation leaves it really uncertain which of two or more possible meanings represents the true intention of the parties. See Master Laboratories, Inc. v. Chesnut, *supra*.

In the case before us the express provisions of the extension agreement adopted the terms, covenants, and conditions in the original lease. Considering the rules and decisions in the cited cases, we are satisfied that the provisions in the original lease for the payment of compensation for terminating the leasehold interest of the plaintiffs applied not only to the original term but to the extended term as well and that no other interpretation of its provisions can be made. The leasehold interest conferred by the extension appears to be a valuable property interest to the lessee as did the existing term which was then extended. Neither do we think the contract evidenced by the original lease and its provisions regarding the extension thereof and the separate extension thereafter granted were ambiguous within the rule stated in Master Laboratories, Inc. v. Chesnut, *supra*. The whole matter as we view it under the admitted facts was the interpretation of the written contract entered into by the parties.

A written contract which is couched in clear and unambiguous language is not subject to a construction other

and different from that which flows from the language used. See Mason v. Mason, 156 Neb. 478, 56 N. W. 2d 614.

On consideration of the lease and the extension clause the trial court properly held that the date, June 30, 1963, in the provisions for the monthly payment in the event of cancellation, referred to the termination date of the lease and when the lease was extended to June 30, 1968, under the same terms, covenants, and provisions, this included an extension of the agreement relative to cancellation to the new termination date of the lease. This court in Mecham v. Colby, 156 Neb. 386, 56 N. W. 2d 299, held: "When the provisions of a contract together with the facts and circumstances that aid in ascertaining the intent of the parties thereto are not in dispute, the proper construction of such contract is a question of law." It applied this rule in that case where summary judgment was entered on a written contract therein set out and discussed the other facts and circumstances involved. We think that the trial court properly did so in the present case.

The defendant sought to introduce new evidence at the time of hearing on the motion for new trial. He sought to produce the evidence of two witnesses, John R. McCormack, an attorney for the defendant, and Robert J. Reinders, an accountant for the defendant, by one or the other or both of which he attempted to identify exhibits 1 to 10, inclusive. These exhibits were letters between the parties, their attorneys, or agents, in which an apparent attempt was in progress to settle the controversy involved herein between them. The testimony of these witnesses, some of which was admitted subject to a later ruling of the court and some of which was not admitted at the time, sought to bring out further evidence concerning the negotiations. Eventually all of this evidence was excluded by the court. The apparent object of this proffered testimony and the exhibits sought to be admitted was to show that there had been, at least during a great portion of these nego-

tiations, no controversy between the parties concerning the larger claim of the plaintiffs involving the amount due for the unused portion of the term, and that at one point the plaintiffs apparently indicated they would have accepted $42,000 in complete settlement. But they relate, generally speaking, to the question of the amount of set-off claimed by the defendant for additional rental on the gross profit of the plaintiffs. The defendant contended at the hearing and now contends that the testimony and exhibits were admissible to show the construction the parties placed upon the lease in the event its terms were held to be ambiguous, and further, that it showed a genuine issue of material fact still existed which the court should have tried. The plaintiffs made objections to the evidence of the witnesses and to the exhibits. Among them was that this evidence would result in reviewing the negotiations for the settlement which was not proper to be admitted in such cases. A review of this evidence fails to show any admission that the cancellation payments were not to be made during the whole of the extended term, but it does show that no apparent claim was made by the plaintiffs to recover such payments for the extended term except at the close of the negotiations. It also showed quite plainly that the correspondence was a part of the negotiations looking for the settlement of the matters in dispute. It is a well-settled rule of law that: "Evidence of an offer or desire to compromise, consisting of a direct offer to buy peace, or settle a controversy without respect to legal liability, is not admissible against the person making it." Myers v. McMaken, 133 Neb. 524, 276 N. W. 167.

In the present case there are no admissions claimed in the correspondence for settlement that the cancellation payments were not to continue throughout the extended term. The defendant, however, points out the absence of any assertion in the early investigation that such a claim was being or could be made. This is the situation that was present in the early case of Kierstead v.

Brown, 23 Neb. 595, 37 N. W. 471. In that case this court in considering this question stated: "But the precise question here is, whether the silence of a party, where a proposition for settlement and compromise has been made to him by his opponent, can be construed into an admission of some fact deemed necessary to maintain his opponent's case. While I am unable to find an authority to this proposition, I think that it cannot. Indeed, I doubt that any action of any court has theretofore called for a discussion of this question.

"But further, it does not appear that the proposition made by the plaintiff presents any fact, the admission of which would tend to establish the plaintiff's cause of action."

The plaintiffs made further objections including that by this evidence it was sought to vary the terms of a written contract and that it was irrelevant and immaterial. We think the objections were proper and that the court did not err in refusing to admit them.

There remains the question of the determination of the cross-appeal of the plaintiffs as to the amount of the percentage rentals to which the defendant was entitled.

The additional agreed facts, so far as they relate to the cross-appeal of the plaintiffs concerning defendant's set-off, are the rental provisions of the lease which, after providing for the sum of $1,000 a month, further provided for an additional rental to be determined and paid as follows:

"(1) For each lease year during the term of this lease (it being understood that each lease year shall be construed as commencing July 1st and terminating on the last day of the month of June next following). 5 per cent of the total gross sales made during said lease year in excess of $240,000.00.

"(2) Said percentage rental shall be determined and paid as follows: at the end of each six months period during the term of this lease, the Lessee shall pay to the Lessor a sum equal to 5 per cent of gross sales made

during each such six month period in excess of $120,-000.00. The amount of each such percentage rental payment shall be determined and paid on or before twenty (20) days following the end of each period above mentioned.

"(3) At the end of each lease year the percentage rental payable for each such period shall be determined and if it shall appear that the percentage paid in accordance with the paragraph numbered (2) of this Section (B) exceeds the percentage rental payable for such period as provided in the paragraph numbered (1) of this Section (B), the Lessee shall be entitled to a refund without interest, of the amount of such excess which shall be paid at the election of the Lessee in cash or by credit against the fixed monthly rental payments falling due thereafter until such excess shall be repaid."

These provisions were included in the same rider that provided for the payment of the $1,500 a month in the case of cancellation of the lease.

On answers to interrogatories it was shown that the gross sales of the restaurant and cafeteria operations under the lease from July 1, 1960, to the end of February 1961, were $325,638.43, of which total sales $56,-303.71 took place in January and February 1961, and the rest took place from July 1, 1960, to December 31, 1960.

The plaintiffs urge that the court erred in granting any judgment on the claimed set-off. Their first contention is that there was only an 8-month occupied term in the last 12-month year, the conclusion of the year when the percentage rentals were to have been adjusted never came, and since there was not a full year involved, there was no lease year within which to make a computation as provided in the contract and consequently nothing was owed on the percentage rentals. Plaintiffs further contend in the alternative that in the event percentage rentals should be computed on the last fractional year of 8 months, nevertheless the full deduction of $240,000 should be deducted before the per-

centage rentals, subject to the 5 percent of excess gross sales, should apply.

The defendant contends that the percentage rentals should be computed for the last fractional year of the term but only two-thirds of the yearly deduction of $240,000 should be subtracted therefrom.

The trial court adopted the defendant's contention. The gross sales for the period as set out above were $325,638.43, from which the court deducted two-thirds of the yearly deduction of $240,000, or $160,000, leaving $165,638.43 subject to percentage rentals and fixed them accordingly at $8,281.92. If the full deduction of $240,-000 were applied, the percentage rentals due from the plaintiffs on the defendant's set-off would be $4,281.92.

In 32 Am. Jur., Landlord and Tenant, § 453, p. 372, the general rule in regard to rent accruing where a tenancy is terminated between the rent days is set out as follows: "Rent does not accrue from day to day. According to the general rule at common law, in the absence of any covenant or agreement for the apportionment of rent in respect to time, it is not so apportionable. So, it is the well-settled common-law rule that where a tenancy is terminated between rent days, there is no apportionment of the rent so as to enable the lessor to recover a proportionate part, and therefore, a lessor cannot apportion rent under a lease at an annual rent and recover rent for part of a year, where, under a proviso in the lease, he terminates the tenancy before the end of a rent year, if the lease does not provide for such apportionment."

In 52 C. J. S., Landlord and Tenant, § 490, p. 267, it is said: "If the lessor terminates the tenancy between rent days, he may not maintain an action for rent which accrued between the last rent day and the termination of the tenancy; and, on the other hand, if the tenant determines the tenancy between rent days, he must pay the rent until the following rent day."

There is an extended annotation in 18 A. L. R. 957,

concerning the surrender and acceptance of the term as affecting a right to recover rent or on an obligation given for rent. On page 960 of this annotation are gathered together the cases concerning rent which accrues after the surrender of the lease on an entire premises, where it is stated: "It is the general rule that a lessor cannot recover rent from a lessee, or on an obligation for rent, where he has accepted a surrender of the term prior to the accrual of the rent claimed, as a discharge from all subsequent liability is effected thereby."

The cases cited in this note are not recent ones but the rule still seems to be adhered to in the absence of the statute apportioning rents in such a situation. See, Stiles v. Lambert, 39 Ala. App. 15, 94 So. 2d 784; Lochner, Receiver, v. Martin, 218 Md. 519, 147 A. 2d 749; In re Jay-Norm Corp., 174 F. Supp. 866; Rogoski v. McLaughlin, 228 Ark. 1157, 312 S. W. 2d 912; Petrelli v. Kagel, 37 Misc. 2d 246, 235 N. Y. S. 2d 383. Although this rule has not been fully considered in any decisions of this court, in Beacom v. Daley, 164 Neb. 120, 81 N. W. 2d 907, it was held that wherever rent is payable yearly, and there is no provision for payment in advance, it is not due until the end of the year. This would seem to adopt the general rule.

In the case before us, the percentage rental provisions of the lease were to be determined as hereinbefore set out. It first provides that for each lease year during the term, which was construed to be commencing July 1 and ending June 30, the percentage rental shall be 5 percent of the total gross sales in excess of $240,000. Second, it provides that the percentage rental shall be determined and paid at the end of each 6 months on the gross sales exceeding $120,000. Third, it provides that at the end of the year the percentage rental shall be adjusted and if the percentage rental paid during the first portion of the year exceeds the rental payable in the second half thereof, the lessee shall be entitled

to a refund without interest of the amount paid on the first half, to be credited on the rental payments falling due thereafter.

The case of Montgomery Ward & Co. v. Collins Estate, Inc., 268 F. 2d 830, involving so-called percentage rentals, in construing a provision of such a lease but where no termination of the term was involved, stated: "Provision in lease that tenant was to pay a percentage rent which was to be determined by amount of sales made 'during each lease year' * * * when considered with other provisions of lease, was construed as requiring the percentage rent to be paid annually, notwithstanding that lease also provided that mortgage indebtedness was to be paid to mortgagee on behalf of landlord by the tenant by means of fixed rent payments which were to be made monthly, semiannually or annually at election of mortgagee, and that mortgagee had elected to receive the fixed rent semiannually." The court also said: "Although no time is fixed, the general tenor of paragraph 3 clearly shows, in our opinion, that, in the absence of some contrary subsequent arrangement, the payments of percentage rent were to be made annually. The logic of this conclusion finds support in the provision in the lease itself to the effect that the amount of the percentage rent was to be determined by the amount of sales made 'during each lease year' and was to be paid 'for each such lease year'. The only relation between fixed rent and percentage rent is that the amount of the annual fixed rent entered into the determination of the 'annual basic sales total'. *As hereinbefore explained, unless and until the 'annual basic sales total' is reached in any lease year, no percentage rent will be payable, and the computation of the amount of percentage rent itself is wholly independent of the computation of the 'annual basic sales total'.* Moreover, although fixed rent is payable semiannually only by reason of the mortgagee's election, it is to be computed at an *annual rate*." (Italics supplied.) Be-

cause of the fact that no termination of the lease was involved, it does not precisely pass on the question before us but does throw light upon it.

As previously stated herein, the gross sales for the period in which the premises were occupied by the plaintiffs were $325,638.43, of which $56,303.71 were sales during the period of January and February 1961, and $269,334.72 occurred during the last half of the year 1960. If there had been a full lease year the total percentage rentals could have been computed for that year and would have been applicable. The landlord exercised his rights of cancellation 4 months prior to the expiration of the lease year at which time the determination was to have been made and the final settlement was to have been made.

"In general rent does not accrue as a debt until the tenant has enjoyed the use of the land for the period for which it is payable. Consequently, in the absence of some agreement or understanding between the parties to the contrary, rent is not due until the expiration of the term; and this is true whether the rent is reserved in gross, or on annual, quarterly, or monthly payments. If the tenant is deprived of the use and enjoyment of the property by unavoidable accident or similar contingency before the end of the term, his liability for rent extends only to that time." 52 C. J. S., Landlord and Tenant, § 511, p. 315.

Under the circumstances we think the trial court erred in allowing the defendant the sum of $8,281.92 on his set-off, and according to our opinion, the defendant is not entitled to recover anything thereunder.

Consequently the judgment is affirmed in part, and in part reversed and the cause remanded with directions to enter judgment for the plaintiffs for the full sum of $132,000 on their petition and disallow the set-off of the defendant entirely.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.