**Gilbert C. SWANSON, Jr., the Estate of Jay F. Swanson, Gilco Trust Company, Trustee for the Gilbert C. Swanson Family Sprinkle Trust, Appellees,**

v.

**BAKER INDUSTRIES, INC., a Delaware Corporation, Appellant.**

No. 79–1359.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1979.

Decided Feb. 14, 1980.

Rehearing Denied March 7, 1980.

Richard A. Spellman, Kutak, Rock & Huie, Omaha, Neb., argued, J. Thomas Marten, Omaha, Neb., on brief, for appellant.

D. C. Bradford, III, Bradford & Coenen, Omaha, Neb., argued, George F. Heiden and D. C. Bradford, Omaha, Neb., on brief, for appellees.

Before BRIGHT, ROSS and STEPHENSON, Circuit Judges.

BRIGHT, Circuit Judge.

This appeal arises out of a breach of contract action brought by Gilbert C. Swanson, Jr., and his relatives (the Swansons) against Baker Industries, Inc. (Baker). Baker had purchased the Swansons' family-owned businesses under two related contracts of sale. The Swansons sued Baker, alleging that the company owed them part of the purchase price due under one of the sale contracts. Following a bench trial, the district court found for the Swansons and determined that Baker owed them $335,538.87.[1] The court accordingly entered judgment in that amount in favor of the Swansons.[2] Baker appeals from the district court's judgment, asserting that the court erred in construing certain contract clauses and thereby miscalculated the damages. We agree in part with Baker's contentions. Accordingly, we reverse and remand for recalculation of damages.

I. *Background.*

The Swansons owned the capital stock of Samardick of Omaha, Inc., (Samardick) and

---

1. The contracts required Baker to pay the purchase price in shares of its stock. In determining that damages amounted to $335,538.87, the district court calculated the market value of the shares Baker owed the Swansons as of April 30, 1973, the date of breach.

2. The district court's opinion is unpublished.

seven other companies which provided armored car and security services to financial institutions in Nebraska, Iowa, and South Dakota. In two contracts of sale dated August 21, 1968, the Swansons essentially agreed to exchange the assets of all eight companies for 26,000 shares of Baker stock.[3] One of the contracts, which provided for sale and transfer of Samardick's assets alone, contained a "second closing" or contingent payment provision. Under this provision, Baker agreed to make a supplementary payment (payable in Baker stock) to the Swansons if Samardick[4] earned a greater average annual after-tax profit in 1971 and 1972 than its adjusted after-tax profit for 1967.

This second closing provision represented an effort by the parties to ascertain, by hindsight, the true value of Samardick at the time of sale. During contract negotiations the parties could not agree on Samardick's value, largely because of the disparity in its earnings for 1966 and 1967. Samardick earned a pre-tax profit of $83,000 in 1966, but only $38,000 in 1967.[5] Baker offered to purchase Samardick and the Swansons' seven other companies at ten times their aggregate 1967 after-tax earnings—approximately $1,280,140 in all—less outstanding indebtedness. The Swansons, however, contended in precontract negotiations that Samardick's greater *1966* after-tax earnings should be aggregated with the 1967 after-tax earnings of the seven other companies to determine the true value of all eight businesses. To compromise their dispute over valuation, the parties agreed on an initial purchase price (to be paid in Baker stock) of ten times the aggregate 1967 after-tax earnings of all eight companies, to be supplemented by a contingent additional payment for Samardick under the second closing provision.

The second closing provision in the contract for sale of Samardick provided as follows:

3.4 *Second Closing.* Subject to the terms and conditions of this Agreement, Baker agrees to issue to Samardick on a date specified in writing not later than April 30, 1973 (herein called the "Second Closing Date"), additional shares of Baker Stock, the number of which shall be determined by:

(a) subtracting $600,000 from the product of ten (10) multiplied by the Average Annual Earnings of Samardick during the period January 1, 1971 through December 31, 1972 (as hereinafter defined), and dividing the figure thus obtained by

(b) the average price (being the mean between the high and the low prices) of Baker Stock on the American Stock Exchange (or, if not so listed or traded, on any other national stock exchange on which Baker Stock is listed or traded, or if not so listed or traded on any national stock exchange, the mean between the quoted bid and asked prices of Baker Stock) on the last day of each quarter such shares shall have been traded during the period from January 1, 1971 to December 31, 1972, and rounding the number so obtained (if a fraction) to the next lowest number of full shares; provided, however, the total additional shares issuable under this Section 3.4 shall not exceed 10,000.

For all purposes of this Section 3.4, Average Annual Earnings of Samardick shall mean the net income of Samardick after all Federal, state and local income taxes calculated by deducting $70,000 from the net income of Samardick's business transferred to Baker before Federal, state and local income taxes for each

3. Baker transferred the 26,000 shares of its stock to the Swanson-owned companies. The Swansons then liquidated those companies and received the Baker stock.

4. After Baker acquired Samardick it made Samardick a branch of Wells Fargo Armored Service Corporation of Nebraska, Inc., a corporation newly formed to manage the Swansons'

armored car businesses. For convenience we refer to both the Swanson-owned entity and its successor, the Wells Fargo branch, as "Samardick" throughout this opinion.

5. The earnings decline reflected Samardick's encounter with competition in the Omaha area for the first time.

fiscal year during the period January 1, 1971, to December 31, 1972, as determined by the then regularly employed independent certified public accountants of Baker, and dividing the sum so obtained by 2. The computation of net income before Federal and state income taxes shall be determined in accordance with the Wells Fargo branch accounting procedures described in Exhibit F hereto.

The undisputed evidence establishes that Samardick's adjusted 1967 after-tax income was approximately $60,000. This amount multiplied by ten totals $600,000, the base figure used in the contract for the second closing valuation of Samardick.[6] The second closing formula required Baker to pay, in stock, additional compensation in the amount of the difference (if any) between ten times Samardick's average annual after-tax earnings for 1971 and 1972 and $600,000. This is the formula:

| | |
|---|---|
| Average net profits for 1971 and 1972, less tax adjustments, times ten | = $ |
| Less  1967 adjusted net profits, less tax adjustments, times ten | = $600,000 |
| =  Difference, if any, to be paid in Baker stock as additional compensation | = $_____ |

The crux of the controversy in this case relates to the determination of the initial figure in this formula. The parties dispute the construction to be given to the final paragraph of the second closing agreement. We reiterate the final paragraph, underlining the two clauses in dispute:

For all purposes of this Section 3.4, Average Annual Earnings of Samardick shall mean the net income of Samardick after all Federal, state and local income taxes calculated by deducting $70,000 from the net income of Samardick's business transferred to Baker before Federal, state and local income taxes for each fiscal year during the period of January 1, 1971, to December 31, 1972, as determined by the then regularly employed independent certified public accountants of Baker, and dividing the sum so obtained by 2. The computation of net income before Federal and state income taxes shall be determined in accordance with the Wells Fargo branch accounting procedures described in Exhibit F hereto.

The Swansons contend that the $70,000 deduction states an agreed figure (in lieu of actual taxes) to be applied over the full two-year period of January 1, 1971 to December 31, 1972. In other words, they argue for an annual deduction from net income of $35,000 in lieu of actual taxes. Baker, by contrast, interprets this "in lieu of tax" clause to require a deduction of $70,000 from net income for each fiscal year in 1971 and 1972.

The Swansons contend additionally that the final sentence of the disputed paragraph precludes Baker from deducting from Samardick's gross income a portion of the salaries of certain administrative, sales and accounting employees which had been paid by Wells Fargo Armored Service Corporation of Nebraska, Inc.[7] They argue that such a deduction is inconsistent with the terms of the contract—specifically, "Wells Fargo branch accounting procedures described in [attached] Exhibit F."

The district court decided both of these issues in favor of the Swansons. The district court determined initially that the stipulated tax provision was ambiguous. Accordingly, the court admitted and relied upon evidence extrinsic to the contract, in-

---

**6.** The parties agreed that the recorded net after-tax income of Samardick for 1967 required adjustments to reflect true annual income. The adjustments included converting nine months of cash basis income to twelve months of accrual income; eliminating certain operating expenses of Swanson enterprises which had been improperly charged to Samardick; making other adjustments to income; and recalculating an income tax reserve for the adjusted "true" income.

These adjustments produced an after-tax net income of $61,955 for 1967. By multiplying this income figure by ten, the parties arrived at a valuation of Samardick (based on 1967 data) of $619,550. The parties rounded off the figure to $600,000.

**7.** *See* note 4 *supra*.

cluding testimony concerning an alleged oral agreement to deduct $70,000 as taxes for the entire two-year period of 1971–1972. The district court then concluded that the tax clause authorized a deduction from net income of $70,000 over the two-year period, or $35,000 per year. The district court also denied the allocation of certain salaries from Wells Fargo to Samardick, holding that the contract's exhibit F unambiguously barred deduction of such expenses.

After allocating undisputed expenses, the district court determined the sum that Baker owed the Swansons by making the following calculations:

| | 1971 | 1972 |
|---|---|---|
| Adjusted [Samardick] branch earnings | $137,100 | $127,863 |
| Income Tax | 35,000 | 35,000 |
| Net earnings after tax | $102,100 | $ 92,863 |

$102,100
  92,863
$194,963 ÷ 2 = average earnings of $97,481.50

Multiplication of this sum [$97,481.50] by ten and subtraction of $600,000 yields the sum of $374,815.

The district court adjusted the $374,815 figure to reflect the value of Baker stock at the time of breach and then determined that Baker owed the Swansons $335,538.87.[8]

II. *Analysis.*

A. *The Tax Clause.*

■ Nebraska law controls the substantive issues in this diversity case. Under the law of Nebraska, as generally, the proper construction of a written contract is a question of law to be determined by the court. *Durand Associates, Inc. v. Guardian Investment Co.,* 186 Neb. 349, 183 N.W.2d 246, 249 (1971); *Bishop Cafeteria Co. of Omaha v. Ford,* 177 Neb. 600, 129 N.W.2d 581, 592 (1964). Where the construction of a contract rests upon documentation and factual findings involving no issues of credibility, we review the district court's construction free of Fed.R.Civ.P. 52(a)'s "clear-

ly erroneous" standard. *Frito-Lay, Inc. v. So Good Potato Chip Co.,* 540 F.2d 927, 929 (8th Cir. 1976). *See In re Romine,* 556 F.2d 895, 897 (8th Cir. 1977); *Mackey v. National Football League,* 543 F.2d 606, 612 (8th Cir. 1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

The district court decided the tax clause was ambiguous because it could be read either as requiring a $70,000 tax deduction from net income "for each fiscal year" in 1971 and 1972, or as requiring a $70,000 deduction for taxes "during the period of January 1, 1971 to December 31, 1972."

We disagree with the view that the contract is ambiguous on its face. In defining average annual earnings, the contract clause calls for a calculation "by deducting $70,000 from the net income * * *." The term "net income" must refer to a specified period. The language of the contract speaks of "net income * * * before Federal, state and local income taxes for each fiscal year." The contract clearly ties "net income" together with "Federal, state and local income taxes"; "for each fiscal year" modifies both phrases. This language therefore directs an annual deduction of $70,000 in lieu of income taxes.

■ In determining whether the disputed language is latently ambiguous, we may examine the evidence of precontract negotiations and other circumstances surrounding the making of the contract. *Sun Oil Co. v. Vickers Refining Co.,* 414 F.2d 383, 386–87 (8th Cir. 1969).[9] In *Sun Oil* we said:

> In determining whether there is an ambiguity, it is proper to examine the disputed language in the context of the entire agreement. And evidence relating to prior negotiations and other circumstances surrounding the making of the contract are to be considered in determining whether the contract is ambiguous. [*Id.* at 387 (citations omitted).]

---

8. *See* note 1 *supra.*

9. *See Restatement of Contracts,* §§ 230, 242. *See also Restatement (Second) of Contracts,* §§ 238, 240 (Tent. Drafts Nos. 1–7) (1973).

The evidence of the parties' precontract negotiations supports our conclusion that the natural meaning of the disputed contractual language was its intended meaning. At meetings on May 10th and 11th, 1968 to discuss the sale of all eight companies, the parties tentatively agreed on terms of sale, as follows:

Terms—(a) Initial payment of 32,000 shares of Baker stock at $40 or a price of $1,280,000 [for all eight companies].

(b) A final payment equivalent to ten times the averaged earnings in the 4th and 5th years from Date of Closing of Samardick of Omaha less that company's earnings for the fiscal year 1967.

During these meetings in May 1968 the parties agreed that, in computing Samardick's average earnings in the fourth and fifth years from the closing date, they would substitute a specific sum in place of actual taxes. At that time the parties were aware of the recently enacted Nebraska corporate income tax.

The record discloses that an in lieu of tax provision first appears in a draft of the contract prepared in early August 1968. That provision read:

For all purposes of this Section 3.4, Average Annual Earnings of Samardick shall mean the net income of Samardick after Federal and state taxes calculated by deducting from the net income of Samardick's armored transport business transferred to Baker before Federal and state income taxes for each fiscal year during the period         to         as determined by the then regularly employed independent certified public accountants of Baker $70,000 and dividing the sum so obtained by 2.

Assuming that this original provision is ambiguous, we believe that both the agreement of the Swansons' attorney-negotiator to a different version and the timing of the parties' revision are significant. The parties' representatives revised the tax provision into its present form in mid-August, shortly after they were informed of accounting adjustments that substantially raised Samardick's true net income for 1967 over the sum otherwise shown by its tax-accounting records. At Baker's request, the Swansons' representatives had supplied expense figures that enabled Baker's accountant to adjust Samardick's 1967 pre-tax net income so that it reflected only expenses properly attributable to Samardick. *See* note 6 *supra.* As adjusted, Samardick's 1967 pre-tax earnings amounted to $109,455; estimated federal and state income taxes on that sum were $47,500, leaving net after-tax earnings of $61,955.

The second closing clause required the payment of additional compensation contingent on the extent to which Samardick's future earnings exceeded the 1967 adjusted after-tax figure. If Samardick's after-tax average annual earnings in the fourth (1971) and fifth (1972) years from the date of closing only equaled those of 1967, as Baker feared and the Swansons doubted, nothing more than the initial purchase price specified in the two executed contracts would be paid. Given the nature of the arrangement and the information available at the contract signing date of August 21, 1978, we think it highly unlikely that either party contemplated an in lieu of tax figure less than $47,500.[10]

None of the written documents discloses the origin of the $70,000 in lieu of tax figure. That figure, however, would be consistent with the expectation of the parties that Samardick's subsequent income might return to the level reached in 1966 —a year in which, as we have earlier ob-

---

**10.** Because the base figure for valuation of Samardick (ten times adjusted after-tax earnings of $61,955, rounded off to $600,000) is calculated on the basis of a tax deduction of $47,500, acceptance of the Swansons' contention would award them a substantial windfall in the valuation of Samardick. If the average profit performance of Samardick in 1971 and 1972 just equaled its before-tax net profits in 1967, the tax deduction of $35,000 per year would translate into an automatic increased average profit of $12,500 in 1971–1972 over 1967 and an increased valuation of $125,000 ($12,500 × 10) over the base. The parties clearly contemplated no such result in their contract negotiations.

served, Samardick's unadjusted pre-tax net income exceeded the comparable 1967 figure by $45,000. The astute businessmen and corporate attorneys who drafted and executed the agreements would certainly appreciate that, if the greater expected annual income were realized in the 1971–1972 period, income taxes would substantially exceed the adjusted tax figure of $47,500 for 1967.[11] Thus, it is unrealistic to infer from the written evidence that the parties intended to adopt an in lieu of tax figure less than $47,500, as the Swansons urge.

To be sure, Cecil Johnson, an attorney-negotiator for the Swansons, testified that the parties had agreed to an in lieu of tax figure of $35,000 per year for 1971–1972. Johnson stated that at early negotiations on May 10–11, 1968, he and Baker's representative agreed "that $70,000 would represent the tax figure for the two years" or at least Johnson "understood" such agreement had been reached.

One can credit this evidence, however, without reading any ambiguity into the contract. In August, just before their representatives executed the contracts, the parties adjusted Samardick's 1967 earnings and realized that the true 1967 earnings bore income tax liabilities of $47,500. Thereafter, the parties revised the tax clause to place the $70,000 figure in the text

preceding the phrase, "for each fiscal year." The period covered (January 1, 1971 to December 31, 1972) still followed immediately after the phrase "for each fiscal year."

The oral testimony may indicate that the construction of the written language urged by the Swansons is a possible one. *See Restatement of Contracts* § 242.[12] However, in light of subsequent developments as shown by documentary evidence, the oral testimony alone furnishes no basis to give an unusual and unnatural meaning to the written language employed by the contracting parties.[13]

■■ The question of whether an ambiguity exists is a matter of law for the court. *Sun Oil Co. v. Vickers Refining Co., supra,* 414 F.2d at 386–87 (and cases cited). The record discloses no substantial evidence that the tax clause calling for a deduction of $70,000 "from the net income * * * before Federal, state, and local income taxes for each fiscal year [during a twenty-four month period]" is latently ambiguous. The evidence of precontract negotiations compels us to conclude, consistent with the language of the contract, that the parties agreed to compute Samardick's average annual income for 1971 and 1972 by deducting $70,000 as income tax for each year.

11. Samardick's 1966 federal income tax return, admitted as evidence at trial, indicates a marginal rate of 48 percent on income over $25,000. Defendant's exhibit D–28 computes Samardick's 1967 estimated federal income taxes at the same rate.

12. Section 242 reads:
Previous negotiations between parties to an integrated agreement, whether the negotiations relate to that agreement or to another, are admissible to show that the agreement has any meaning which is not impossible under the standard stated in § 230, though that meaning would not otherwise have been given to the agreement.
Comment a to this section provides in part that:
[E]ven where the writing is not ambiguous on its face, the circumstances under which the parties contract may be looked at to establish an ambiguity, as well as to indicate the proper choice of possible meanings[.]

13. Baker contends that we should reach this conclusion for an additional reason—namely, that Johnson's testimony was undercut by a letter he wrote to Baker on August 7, 1973. In that letter Johnson referred to, and apparently relied upon, calculations made by Baker incorporating an annual deduction of $70,000 in lieu of actual taxes. Although Johnson objected to several other items included in Baker's figures, he did not challenge the $70,000 annual deduction.
The trial judge excluded Johnson's August 7 letter under Fed.R.Evid. 408, which governs compromise and offers to compromise. Baker vigorously asserts that Rule 408 is inapplicable because Johnson's letter did not offer any compromise but rather demanded the maximum number of Baker's shares authorized by the contract. Baker concedes, however, that the letter was sent during the period of settlement negotiations, and Baker argues that parts of the letter should still be excluded under Rule 408. We need not decide this issue in light of our determination on the merits.

B. *Deduction of Other Disputed Expenses.*

The district court found that the contract's exhibit F contained all the categories of expenses which the parties intended to be deducted in computing Samardick's 1971 and 1972 pre-tax net income. The district court therefore barred evidence of other expenses under the parol evidence rule as inconsistent with the contract. Baker contends that other expenses constitute part of "Samardick's business transferred to Baker" and may be deducted under the language of the contract. We have reviewed the evidence and sustain the determination of the district court on this issue for reasons set forth in its (unpublished) opinion dated January 8, 1979.

III. *Conclusion.*

For the reasons set forth above, we reverse in part and vacate the judgment of the district court. We remand the case to that court for recomputation of damages and entry of judgment consistent with this opinion.