CITY OF LINCOLN, NEBRASKA, A MUNICIPAL CORPORATION,
DOING BUSINESS AS LINCOLN ELECTRIC SYSTEM, APPELLEE, V.
NEBRASKA PUBLIC POWER DISTRICT, APPELLANT.
614 N.W.2d 359

Filed July 18, 2000. No. A-98-866.

William M. Lamson, Jr., Michael S. Degan, and Robert A. Mooney, of Lamson, Dugan & Murray; Laurence V. Senn, Jr., Patricia A. Griffin, and Mark E. Chaiken, of King & Spalding; and John R. McPhail and Robert A. Green for appellant.

Thomas J. Culhane and David C. Mussman, of Erickson & Sederstrom, P.C.; and Brad Fagg and John E. Matthews, of Morgan, Lewis & Bockius L.L.P., for appellee.

HANNON, INBODY, and CARLSON, Judges.

HANNON, Judge.

In 1968, the parties contracted with respect to the Cooper nuclear power plant (Plant), a nuclear electric generating station that the Nebraska Public Power District (NPPD) was about to build near Brownville, Nebraska. The Power Sales Contract provided that the City of Lincoln, Nebraska, doing business as Lincoln Electric System (collectively LES), was to receive 12.5 percent of the electricity generated by the Plant and that in consideration for that power, LES was required to pay 12.5 percent of the costs of operating the Plant. In 1993, the Plant was scheduled to be shut down (outage) for refueling and maintenance,

and this outage was extended. In 1994, the plant was shut down for a period that was not planned.

The operation of the Plant is under the regulatory power of the Nuclear Regulatory Commission (NRC), and during 1993 and 1994, it issued several notices of violations and imposed civil penalties upon NPPD in connection with the Plant's operation. LES alleges the extension of the 1993 outage, the unplanned 1994 outage, and the civil penalties were caused by NPPD's mismanagement as defined in the contract. LES sued NPPD to recover the damages it claims to have suffered because it did not receive power during those outages and for the increased costs it incurred to satisfy its power needs and the amount by which its 12.5 percent share of the Plant's costs increased, all of which LES alleges resulted from NPPD's mismanagement. LES maintains that the documentation generated by NRC's self-inspections, NRC's notices of violations, and reports from inspections by third parties that NPPD requested shows that the outages and civil penalties were caused by NPPD's mismanagement of the Plant. Upon the basis of this documentation, the trial court granted a partial summary judgment to LES on the issue of liability for damages caused by the outages and for the penalties. Later, a jury determined LES' damages to be $9.8 million.

Upon appeal, we conclude that the evidence of mismanagement by NPPD does not require an inference that NPPD was guilty of mismanagement as defined by the contract, although it might justify a finding to that effect, and that therefore the trial court erroneously granted a partial summary judgment on liability. Accordingly, we reverse, and remand for a new trial on liability and other factual issues.

By way of general background, the evidence establishes that from 1968 until 1993, there had been no serious difficulties between the parties. NPPD's evidence takes the position that after the Three Mile Island event in Pennsylvania in 1979, the oversight of nuclear plants by NRC changed remarkably. For whatever reason, in late 1992 and thereafter, reports on the Plant's operation and management were much less favorable and became critical of certain portions of Plant operations. NRC inspections found violations of its regulations at the Plant and

assessed civil penalties against NPPD in 1993 and 1994 totaling $700,000.

From the voluminous evidence, it appears that there was never any claim that the mismanagement directly resulted in a nuclear incident, or a near incident. However, it appears that the danger of a disaster from some sort of malfunction of a nuclear reactor quite naturally results in nuclear plants having many safety and fallback systems that are intended to function in the event some problem with the reactor might arise. Apparently, the nuclear industry spends a great deal of time checking and rechecking to be sure that safety systems will function when and if they are needed. It appears that there were failures of Plant personnel to find improper conditions in the operating and safety systems and that there was a failure of one safety system to work when it could have been needed, which were all taken by NRC as an indication that the systems had not been properly inspected and tested. There was one case where an improper condition was not reported as required. NRC and other inspectors attributed these failures to the failure of NPPD managers to have systems of inspections and supervision and to create a work atmosphere which would ensure such failures did not happen.

In reading the testimony and reports, one is struck by the vagueness of the reports and the testimony of the various inspectors concerning the shortcomings of the Plant's management. As an example, a statement in a "Diagnostic Self Assessment" report, which is relied upon by LES to support its claim of mismanagement, states:

> Ongoing problems with plant and system status control, procedure quality and adherence, the lack of a strong work control program, weak industrial safety practices, ineffective independent oversight and quality assurance program, and a general problem of inadequate programs that do not meet regulatory requirements, all reflect standards which have not kept pace with industry practice.

Except for three or four events where equipment was not as it was expected to be or did not function as it was supposed to function, the evidence is of the general opinion much like the above quote. LES does not, however, rely upon opinion evidence.

The observation of the vagueness of the evidence is not intended to be critical of the persons preparing the reports, but is only a recognition of the difficulty that nuclear plant managers and inspectors necessarily have in practicing and communicating their art. Such vague terminology also makes it difficult to judge the management quality of NPPD against the standard set forth in the parties' contract and industry standards, or against any other standard.

*Contract.*

The contract between the parties was made on May 21, 1968, and it will continue until at least September 22, 2003, and perhaps beyond. The parties operated under the contract, and uncontested amendments to it, without difficulty until 1993. The contract provided that NPPD would own the Plant and that it agreed to make available to LES 12.5 percent of the energy generated at the Plant. LES was required to pay 12.5 percent of all expenses NPPD incurred in operating the Plant. The definition of delivery of power, power costs, and the methods of billing and payment are all extensively defined and provided for in the contract. But since there is no dispute concerning these provisions, they will not be summarized.

Section 9 of the contract provides in significant part:

> *The District may temporarily interrupt or reduce deliveries of electric energy to the Purchaser if the District determines that such interruption or reduction is necessary in case of emergencies* affecting the ability of the District to produce or deliver power from the Nuclear Facility. In order *to refuel, install equipment in, make repairs to, replacements, investigations and inspections of, or perform other maintenance work on the Nuclear Facility . . .* the District [will provide a notice of outage].

> Except as interrupted by Uncontrollable Forces, or as otherwise provided in this Contract, the District shall operate the Nuclear Facility and make power and energy therefrom available to the Purchaser in accordance with this Contract . . . .

(Emphasis supplied.)

"Uncontrollable Forces" is defined in § 2(h) as "any cause beyond the control of the District, and which by the exercise of

due diligence the District is unable to prevent or overcome, including but not limited to any act of God . . . and orders of government agencies with proper jurisdiction . . . ."

Section 15 of the contract is perhaps the most significant provision with respect to the issues of this action, and it provides in significant part: "The District agrees that it will *operate and maintain and make renewals and replacements to the Nuclear Facility and the EHV Facilities in an efficient and economical manner, consistent with good business and utility operating practices.*" (Emphasis supplied.) The remainder of this section provides for consultation on NPPD practices and an advisory operating committee, about which there seems to be no dispute.

Section 21 provides:

> It is recognized by the parties hereto that the *District* in its operation of the Nuclear Facility *must comply with the requirements of the Permit and License* for the construction and operation of the Nuclear Facility as issued by the Atomic Energy Commission [now known as the NRC] and amendments thereof from time to time made, and with the Bond Resolution, and it is therefore accordingly agreed that *this Contract is made subject to the terms and provisions of said Permit and License and of the Bond Resolution.*

(Emphasis supplied.)

LES maintains that NPPD did not operate the Plant "in an efficient and economical manner consistent with good business and utility operating practices." We shall use the term "mismanagement" to convey LES' claims that NPPD's conduct or the lack of conduct on NPPD's part violated this provision.

*Pleadings.*

In the petition as amended, LES alleged the execution of the contract and the provisions it claimed NPPD violated, most of which are quoted above. LES did not allege any contractual violation until 1993, but it did allege that the Plant was shut down on one occasion; that a shutdown was extended on another; that the NRC imposed penalties on NPPD for violations; and that the outages and penalties were the result of improper maintenance

of Plant equipment, inadequate corrective action programs, and mismanagement. In NPPD's answer, it denied these allegations.

In support of the allegation of mismanagement, LES alleged NRC took certain actions. LES attached to the petition certain documents which contain statements derogatory of NPPD's management of the Plant, and parts of these documents were quoted in the petition. In summary, LES alleged (1) that the "Systematic Assessment of Licensee Performance" report for the period from January 19, 1992, to April 24, 1993, showed marked deterioration of NPPD performance; (2) that the "Operation Safety Team Inspection" report of November 1993 by NRC showed no improvement; (3) that in January 1994, NRC notified NPPD that the Plant was identified "as trending adversely from a safety performance perspective"; (4) that in May 1994, NRC identified a large number of additional violations or deficiencies in Plant management, hardware, and operations; (5) that as a response to the operation safety team inspection report and NRC's placement of the Plant with a group of plants exhibiting declining safety performance trends, NPPD developed the "Cooper Nuclear Station Near Term Integrated Enhancement Program," in which NPPD admitted that "Senior Management has not been effective in directing the operations of the" Plant and that management was remiss in not recognizing negative indicators over the past 18 months; (6) that on June 21, 1994, NRC documented the Plant's declining performance by a letter which is attached to the petition; (7) that between May and August 1994, NRC conducted further inspections; (8) that on May 25, 1994, NPPD shut down the Plant when standby diesel generators were declared inoperable; (9) and that on May 27, 1994, NRC issued a "Confirmatory Action Letter," which it later amended, identifying several matters which would have to be addressed before the Plant could begin operations and stating that the failure to implement appropriate action was a contributing factor to the failure of the equipment.

LES alleged that NRC conducted a diagnostic evaluation of the Plant during August and September 1994 and that between July 25 and August 19, 1994, NPPD had a diagnostic self-assessment by a team composed of persons from outside sources which issued a report on September 1, 1994. The diagnostic

self-assessment report found that the root causes of the Plant's performance problems were (1) that senior management failed to provide the policy, leadership, and direction necessary to maintain appropriate corporate-wide standards of performance and had not effectively implemented appropriate standards and expectations or provided appropriate direction and supervision, which resulted in the lack of a questioning attitude and a willingness to live with problems; (2) that programs were poorly defined and lacked the guidance necessary for consistent and effective implementation; and (3) that NPPD self-assessment and independent oversight activities had been ineffective in identifying deficiencies and had failed to ensure that lessons learned by the industry were applied to the Plant.

LES further alleged that on December 12, 1994, NRC issued a "Notice of Violation and Proposed Imposition of Civil Penalties" in the amount of $300,000 and that on January 18, 1995, NPPD acknowledged the violation and paid the penalty.

In NPPD's amended answer, it admitted that the specific actions alleged in the amended petition had taken place and that the reports alleged therein had been issued, and it also admitted that the words quoted in the petition from these reports were contained in those documents, but alleged that the words were taken out of context and referred the court to the entire document. The effect of NPPD's pleading was to admit the existence of the alleged reports and the alleged actions but to deny any inference that these documents or admissions showed mismanagement under the terms of the contract.

In 31 largely repetitive paragraphs in LES' amended petition, LES alleged that NPPD breached §§ 3(a), 7 as amended, 9, 15, and 21 of their contract. Sections 3(a) and 7 contain promises by NPPD to deliver the power in a certain fashion and do not directly impact the issues of this case. The significant parts of the other alleged contract sections are quoted above. Nothing would be added to this opinion by summarizing the allegations in these paragraphs.

LES also alleged NPPD violated § 4(c) and (h) by overstating monthly power costs. These contract subsections define the monthly charges, but these provisions are only significant if liability is established.

LES alleged it was damaged in the amount of $8,664,622.73, which includes the lost profits, in the amount of $3,432,682.21; the increased costs for replacing energy to serve its customers, in the amount of $3,231,940.52; and the increased costs for the additional operating and maintenance costs due to the outages, in the amount of $2 million. These allegations were denied.

NPPD essentially alleged in its answer, in summary, that recovery by LES for the outages was prevented by the contractual provisions which gave LES the right to only 12.5 percent of the power actually generated and required LES to pay 12.5 percent of monthly power costs. NPPD argued that if LES received 12.5 percent of the power generated, it had no right to complain and that it must pay 12.5 percent of the power costs, because the contract is essentially an "output contract," brief for appellant at 43, entitling LES to only 12.5 percent of the electricity produced by the Plant. NPPD also alleged that its obligation to make power was excused in the event of uncontrolled forces or emergencies, planned interruption, and outages due to the obligations of its license; that the outage and the extension were the result of one of the events excluded by the contract; and that therefore no liability could arise. It also alleged that LES paid similar charges in the past, and NPPD relied upon that action, and that LES failed to avail itself of the dispute resolution procedure provided for in § 4(g) of the contract.

*Trial Court's Order.*

On March 3, 1997, LES moved for a "summary judgment on liability for breach of contract for the reason that there are no genuine issues as to any material facts, and LES is entitled to a judgment on liability as a matter of law." On January 12, 1998, the trial court filed an order, inter alia, sustaining that motion and sustaining LES' objections to exhibits 43 through 46, and 49 through 51, and denying NPPD's objections to certain of LES' exhibits. The trial court interpreted the applicable contract provisions in much the same way that we interpret them below, and on the basis of the factual events and conclusion in the reports contained in the evidence and admitted by NPPD, the trial court granted partial summary judgment on liability. The court also ruled that certain exhibits should not be introduced at trial.

NPPD's motion for a new trial directed at this order was filed and was denied before the trial on damages.

Neither the motion for partial summary judgment nor the court's order granting it was specific about what was being determined other than "liability." In the discussion contained in the order, the court does state that the "Defendant is liable for any damages resulting from the extension of the planned 1993 refueling outage and/or the unplanned outage from May 25, 1994 through February 21, 1995."

In the process of instructing the jury, the court necessarily became more specific on the terms of its partial summary judgment, and a close reading of the order and the jury instruction discloses a more detailed ruling on the motion for summary judgment. In significant part, the court instructed the jury in instruction No. 3 as follows:

> The Court has held that NPPD breached this contract when it failed to deliver electricity from Cooper [the Plant] to LES during a period in 1993, when a planned Cooper refueling outage was extended, and from May 25, 1994 until February 21, 1995, when Cooper experienced an unplanned outage. NPPD is liable for any damages that LES sustained as a direct and proximate result of NPPD's failure to deliver electricity during the 1993 extension and/or the unplanned outage from May 25, 1994 through February 21, 1995. The Court has held that NPPD's failure to deliver electricity during the entire period from May 25, 1994 through February 21, 1995 constituted a breach of contract. However, the Court has not determined the number of days during the 92-day extension of the 1993 refueling outage which constituted a breach of contract for failure to deliver electricity. The number of days during which NPPD breached the contract by failing to deliver electricity during 1993 refueling outage extension is an issue of fact for the jury to decide.
>
> The Court has held that, during the periods leading up to and during the 1993 refueling outage extension and the unplanned 1994/1995 outage, NPPD breached the contract by failing to maintain and operate Cooper in an efficient and economical manner, consistent with good business and utility operating practices. . . .

The Court has also held that, during the periods . . . NPPD breached the contract by failing to comply with its operating license on several occasions, including violations of license requirements and/or NRC regulations that resulted in the NRC imposing civil penalties in the amount of $700,000. NPPD is liable for any damages that LES sustained as a direct and proximate result of NPPD's failure to comply with its operating license.

The trial court went on to tell the jury that the only issues it was to decide were (1) the number of days which NPPD breached the contract by failing to deliver electricity during the 92-day extension of the 1993 refueling outage; (2) whether or not NPPD's breaches of contract were a proximate cause of some damage to LES; and (3) if LES suffered damage, what was the nature and extent of that damage.

The jury returned a verdict for $9.8 million.

## ASSIGNMENTS OF ERROR

NPPD alleges the trial court erred (1) in granting a summary judgment on the issue of liability, (2) in deciding proximate cause as a matter of law, (3) in failing to direct a verdict for NPPD on the issue of damages, and (4) in improperly instructing the jury. The claimed errors in granting LES a summary judgment on liability is the threshold issue, and the others would need to be considered only if we were to hold the court correctly granted the partial summary judgment. The alleged error of refusing to grant NPPD a directed verdict on damages is considered below as part of our consideration of the threshold issue.

## STANDARD OF REVIEW

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Lewis v. Board of Comrs. of Loup Cty.*, 247 Neb. 655, 529 N.W.2d 745 (1995).

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from

those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

## ANALYSIS

*Drafting of Trial Court's Order.*

 The trial court asked the attorneys for LES to draft the order memorializing the court's ruling on the motion for partial summary judgment, and the LES attorneys drew that order. NPPD argues that it was error for the court to do so. We realize this procedure has the unfortunate possibility of creating an impression that the trial judge is friendly to the party that is asked to draw the order. However, this procedure is followed by almost every court in the state without significant complaint. Anyone familiar with the history of the operation of the district courts in Nebraska would realize that the party prevailing on a matter has been historically asked to draw the order memorializing that judgment. This practice grew out of the fact that lawyers usually had adequate secretarial services and that judges frequently had none, particularly when they were hearing cases away from their principal offices. The judge, in any case, is responsible for the contents of the order that he or she signs. It is not error for a trial judge to ask the prevailing party to draft the order memorializing the judgment granting relief.

*Determination of What Constitutes Evidence*
*on Motion for Partial Summary Judgment.*

In the parties' statements of facts, they cite to records to support many of the facts in their respective summaries of facts, which are not proper sources of facts on LES' motion for summary judgment.

 Many of the citations contained in NPPD's brief cite to exhibits 43 through 46, and 49 through 51. The trial court specifically sustained LES' objection to these exhibits. NPPD did not assign that ruling as error, and it does not argue that the trial court erred in that ruling except in its reply brief. In its briefs, NPPD simply used the offered exhibits as though they had been received. Alleged errors at trial which are argued on appeal but not assigned will not be considered by an appellate court. *Wolf v. Walt*, 247 Neb. 858, 530 N.W.2d 890 (1995).

Errors raised for the first time by an appellant in a reply brief will not be considered. *Morton v. Farmers Co-op Bus. Assn.*, 1 Neb. App. 552, 510 N.W.2d 326 (1993) (appellant argues in reply brief that court erred in not ruling on objection to evidence at summary judgment hearing).

The citation to support most of the facts summarized in NPPD's brief refers to the excluded exhibits. When questioned about this matter at oral argument, NPPD's counsel stated that he felt the general assignment of error that the court erred in granting LES' summary judgment of liability was adequate to raise the question of possible error in sustaining the objections to these exhibits. We think this position is incorrect.

In the first place, NPPD's position ignores the Nebraska Supreme Court rule providing that the appellant's brief shall contain "[a] separate, concise statement of each error a party contends was made by the trial court." Neb. Ct. R. of Prac. 9D(1)e (rev. 1999). The rules also require that the argument shall present each question separately. See Neb. Ct. R. of Prac. 9D(1)h (rev. 1996). The function of the assignments of error is to set out the issues presented on appeal, to notify the appellee of the questions submitted for determination in order that the appellee may know what contentions the appellee must meet, and to advise the court of the issues submitted for decision. *Cook v. Lowe*, 180 Neb. 39, 141 N.W.2d 430 (1966). If an error could be raised for the first time in a reply brief, the appellee would have no opportunity to argue the belatedly raised point. This procedure would ignore the objectives intended to be accomplished by assignments of error. For these reasons, we must decide this appeal as though exhibits 43 through 46, and 49 through 51 have not been offered in evidence.

LES did not follow the rules of the Nebraska Supreme Court relating to briefing in one serious aspect. On many occasions, LES cited to the transcript to support many of the facts in its summary of the facts. The well-established rule is that affidavits, depositions, and other evidence considered at a hearing on a motion for summary judgment must be preserved in a bill of exceptions filed in the trial court before such evidence can be considered during appellate review of the motion. *Sindelar v. Hanel Oil, Inc.*, 254 Neb. 975, 581 N.W.2d 405 (1998); *Vilas v.*

*Steavenson*, 242 Neb. 801, 496 N.W.2d 543 (1993). See *Rodriguez v. Nielsen*, 259 Neb. 264, 609 N.W.2d 368 (2000).

In *Brown v. Shamberg*, 190 Neb. 171, 206 N.W.2d 846 (1973), the plaintiff conceded that affidavits used as evidence at a hearing on a motion for summary judgment must be identified, offered into evidence, and embodied in a bill of exceptions as a prerequisite to their review on appeal, but argued that under the procedure applicable at that time, depositions were a part of the court record and therefore need not be made a part of the bill of exceptions if filed with the clerk of the trial court beforehand. The *Brown* court did not agree and held that the deposition must be made a part of the bill of exceptions to be considered.

Under the system prevailing in Nebraska, the bill of exceptions is used to present factual evidence to an appellate court, and the transcript is used to present pleadings and orders of the case to the appellate court. See *Sanwick v. Jenson*, 244 Neb. 607, 508 N.W.2d 267 (1993). We cannot rely upon information in the transcript to establish facts, even a stipulation of facts. See *Higgins v. Postal Life & Casualty Ins. Co.*, 161 Neb. 278, 73 N.W.2d 175 (1955). Affidavits filed with the clerk of the trial court and found in the transcript, but not preserved in the bill of exceptions, cannot be noted by an appellate court. *Murphy v. Murphy*, 237 Neb. 406, 466 N.W.2d 87 (1991).

Much, and perhaps all, of the materials cited by NPPD to the transcript is also found in the bill of exceptions, but the citations are wrong and useless to the court, if not harmful, in the process of review. The failure of both parties to follow the rules of the Supreme Court in these matters has made reviewing a difficult case with a voluminous record much more difficult and has made the parties' briefs of less value than is expected in cases such as this.

*Interpretation of Contract.*

NPPD argues that in granting the partial summary judgment, the trial court found that NPPD breached the contract simply by failing to deliver power during the two outages. It argues that the contract is essentially an output contract and that as long as it discharges in good faith its obligation to deliver the appropriate share of its output, it cannot be liable. See *Meyer v. Sandhills*

*Beef, Inc.*, 211 Neb. 388, 318 N.W.2d 863 (1982). NPPD therefore argues that since it did not have any output during the outages, it is not and could not be liable for any damages suffered by LES as a result of LES' not receiving power during the outages. This is a point raised by NPPD's motion for directed verdict and also by its third assignment of error. We do not agree with this interpretation of the contract, and we conclude that the trial court was correct in denying NPPD's motion for a directed verdict.

NPPD further argues that § 9 of the contract expressly authorizes it to shut down for inspection, maintenance, refueling, et cetera and that LES expressly agreed to pay its proportionate amount of expenses during outages. We do not agree with any interpretation of the contract which absolves NPPD from liability for all outages, or for those that did in fact occur.

NPPD argues that § 15, quoted above, which essentially provides that NPPD agrees to operate and maintain the Plant "in an efficient and economical manner, consistent with good business and utility operating practices," is ambiguous, citing *Production Credit Assn. v. Eldin Hausserman Farms*, 247 Neb. 538, 529 N.W.2d 26 (1995). NPPD argues that parol evidence is admissible to construe the meaning of technical terms and usages in that provision and that if read without reference to external industrial standards, § 15 is ambiguous.

NPPD argues that § 21 of the contract is ambiguous as a matter of law. NPPD states that LES argues that by § 21, NPPD undertook the affirmative obligation to adhere to all NRC regulations; whereas, NPPD maintains § 21 requires it to adhere to the terms of its license. NPPD argues that therefore, it cannot be liable for any acts which are necessary to maintain its license, such as shutting down the Plant. NPPD argues that at the very least, the parties' two interpretations of the provision make the provision ambiguous.

" 'The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous.' " *Moller v. State Farm Mut. Auto. Ins. Co.*, 252 Neb. 722, 726, 566 N.W.2d 382, 385 (1997), quoting *Knox v. Cook*, 233 Neb. 387, 446 N.W.2d 1 (1989). An instrument is ambiguous if

a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Knox, supra.* In interpreting contracts, the court as a matter of law must first determine whether the contract is ambiguous. *Id.* Regarding a question of law, this court has an obligation to reach its conclusion independent from the conclusion reached by a trial court. *Id.*

A contract must be construed as a whole, and if possible, effect must be given to every part thereof. *Crowley v. McCoy*, 234 Neb. 88, 449 N.W.2d 221 (1989); *Mills v. Aetna Ins. Co.*, 168 Neb. 612, 96 N.W.2d 721 (1959).

> When the provisions of a contract, together with the facts and circumstances that aid in ascertaining the intent of the parties thereto, are not in dispute, the proper construction of such a contract is a question of law and determinable upon a motion for summary judgment. *De Los Santos v. Great Western Sugar Co.*, 217 Neb. 282, 348 N.W.2d 842 (1984); *Bishop Cafeteria Co. v. Ford*, 177 Neb. 600, 129 N.W.2d 581 (1964); *Grantham v. General Tel. Co.*, 191 Neb. 21, 213 N.W.2d 439 (1973).

*Gilbreath v. Ridgeway*, 218 Neb. 822, 826, 360 N.W.2d 474, 477 (1984).

We conclude that § 15 requires NPPD to operate and maintain the Plant in an efficient and economical manner consistent with good business and utility practices. This provision is not inconsistent with § 21, in that if the Plant is shut down pursuant to its license, NPPD is not liable for the outage, unless the Plant is shut down due to the mismanagement of NPPD as defined in § 15. Section 15 is not inconsistent with § 9, in that NPPD is not liable for outages that are necessary for emergencies, refueling, or any of the causes specified in the contract, unless the emergency or other causes are the result of NPPD mismanagement. NPPD is liable for damages it caused LES by outages or any other damage due to violation of § 15. NPPD's liability for any given outage must of course be predicated upon NPPD's mismanagement. In this appeal, the controlling question is, therefore, whether the evidence establishes without a genuine issue of material fact that outages and fines were caused by mismanagement as defined by § 15.

*LES' Arguments.*

In LES' amended petition and in its brief, it used the approach of quoting or summarizing admissions that NPPD made by one means or another. These admissions include that NPPD failed to keep the Plant up with improving industry standards; that it failed to detect and identify a potentially significant condition adverse to quality; that its program designed to identify and correct such problems had done neither; that it made inaccurate and incomplete written representations to NRC; that it admitted violations under oath and paid the fine; and that the restarting delay of 149 days rather than 56 days was a delay of a magnitude that was outside industry standard and expectation, as well as other admissions of similar impact, such as that NRC told NPPD that the Plant could not reopen in 1993 until it corrected specified deficiencies and violations.

In LES' brief, it cites to allegations in its petition that were admitted by NPPD's answer: "NRC placed Cooper [the Plant] on notice that it was a nuclear plant identified as trending adversely from a safety performance perspective," brief for appellee at 25, and NRC stated that "[a]fter the conclusion of the 1993 refueling outage, Cooper continued to exhibit an adverse trend in performance from a safety perspective," brief for appellee at 17. Without a citation to the record, LES states, "In May 1994, NPPD's continuing divergence from industry standards of performance resulted in an incident that forced an unplanned shut-down of Cooper." *Id.* We find no such evidence. It may be that a trier of fact might infer these conclusions, but we cannot find direct evidence to support them.

In LES' brief, it argues that in support of its motion, LES submitted evidence of NPPD's factual admissions regarding NPPD's failure to adhere to industry standards and multiple violations of NRC regulations, which resulted in an unplanned extension of a 1993 refueling outage and an unplanned 9-month shutdown in 1994-95. LES proposed 45 specific material facts, as to which it contended there is no dispute, and challenged NPPD to rebut any of its evidence or those proposed facts. (We have been unable to find a list of the proposed 45 material facts.) LES contends that based upon those "undisputed" facts, NPPD

was liable as a matter of law for the 1994 outages because it breached its contractual duties.

We recognize that many facts are admitted by NPPD's answer, that many facts are contained in the various reports and correspondence, and that many other facts were admitted by NPPD when its board of directors accepted unfavorable reports from inspections it authorized or when NPPD agreed with NRC's notices of violations. None of these admissions get to the point of admitting that NPPD operated and maintained the Plant in an inefficient or uneconomic manner, or inconsistent with good business and utility operating practices, but many of them do attribute errors at the Plant due to management. None of these admissions admit that the outages were caused by mismanagement.

The trial court found that the outages were a direct and proximate result of the violations and that NPPD failed to maintain and operate the Plant in an economic and efficient manner. We do not find direct evidence to support these findings, although we recognize these findings might be inferred from the numerous admissions.

*Explanatory Evidence.*

The gist of this action is a suit for recovery for outages that were either ordered by NRC or were made necessary because the Plant was not being operated in accordance with NRC safety requirements. Under our interpretation of the contract, NPPD would be liable for damages resulting from the outages only if NRC ordered the shutdown or the extension of a shutdown, or both, due to NPPD's mismanagement; or if NRC assessed a penalty due to faulty Plant operations because of NPPD mismanagement; or if the Plant was shut down voluntarily because NPPD's mismanagement produced conditions which made a shutdown by NRC imminent. We could not understand these questions without some understanding of NRC's regulation of nuclear power plants and the Plant in particular. The only place we found an explanation which we could follow was the report and deposition by Richard H. Vollmer.

Vollmer had 44 years' experience in the nuclear industry, had worked for NRC off and on, and even had something to do with

NRC's oversight of the Plant during 1993-94. His report and deposition were introduced by NPPD, and much of what was said is disputed. However, under the standard of review applicable to the review of an order granting a summary judgment, we must view the evidence in the light most favorable to NPPD. Vollmer's evidence at least gives us a background to understand the voluminous evidence, and for that reason, this evidence is summarized first.

Vollmer traced the history of NRC's regulation of nuclear power plants, and of the Plant, in order to provide an evaluation of the regulatory performance of NPPD's operation of the Plant to the requirements and expectations of NRC from 1980 through the May 25, 1994, "forced outage."

He stated that the NRC's jurisdiction is based in the Code of Federal Regulations, which provides the broad standards for the design, construction, operation, and decommission of nuclear power plants. Other NRC requirements are in the forms of "Generic Letters, Bulletins, and Orders." Bulletins are requirements that plants of a certain class must fulfill. Orders are specific directions generally directed to one plant or actions to be taken to meet regulatory requirements, and orders give the right to a hearing if requested.

NRC regulatory guidance is given by regulatory guides and "NUREG reports." Generally, these need not be followed. Vollmer stated "regulatory expectations" are the least defined and most subjective of the demands on nuclear utility performance by NRC. They are generally informally communicated by report, actions taken on other utilities, speeches, or communications between the licensee and NRC at all levels. They differ between NRC regions, headquarters, and individuals.

After the Three Mile Island incident in 1979, regulatory emphasis was given to operations, as opposed to a plant's compliance. Vollmer stated, in a report on the regulatory performance of the Plant, dated February 28, 1997, "[P]erformance-based rather than compliance-based regulation was emphasized in the 80s and through 1994." Performance expectations varied from region to region and between resident inspectors. NRC gave attention to the development of performance indicators, initially by Systematic Assessment of Licensee Performance

(SALP) reports and then by senior management meetings, which considered various indications of performance in plants.

The SALP program began in 1980 to improve NRC's program, to assist in allocating its resources, to establish a basis for dialogs with licensee management, and to provide a mechanism to focus attention on a licensee's performance and weaknesses. NRC conducts inspections of plants to determine the state of reactor safety, and the inspection gathers information for the SALP report. The inspection evolved into covering plant operations, maintenance, surveillance, engineering and technical support, and plant support. NRC's policy of requiring higher and higher levels of safety had the effect of requiring a licensee's performance to improve between 1980 and 1993 in order to keep the same SALP score. In the SALP report, NRC assigns a rating of 1, 2, or 3 to each functional area. A 1 indicates that a plant's performance substantially exceeds regulatory requirements and that the plant requires reduced NRC attention; a 2 indicates that the licensee's regulatory performance exceeds that which is needed to meet regulatory requirements and that the plant requires normal attention; and a 3 indicates that its performance does not exceed minimal regulatory requirements and that the plant may expect increased NRC attention. Vollmer states that SALP reports supply the most regular comprehensive feedback to licensees, but they may not communicate NRC expectations. Operational performance must improve for SALP ratings to stay the same. Vollmer also describes the various other inspections.

When results of a senior management meeting indicate a plant should be subject to increased regulatory attention, a " 'Trending Letter' " could be issued, indicating that performance appears to be dropping and calling for increased management attention, and even more significance is given when a plant is placed on the " 'Watch List.' " The latter designation results in an approximately $200 million economic penalty over 2 to 3 years.

Vollmer opined that NRC's expectations are the least well defined but can have the most profound impact on a facility and that the measure of operational performance of all plants has risen over the years. This has made it difficult for plants to main-

tain a balance between compliance with regulations, safety, and management of costs and production.

Vollmer describes the three basic enforcement tools that NRC has as follows: (1) a notice of violation describes the violations, requires a response of admission or denial and when and how compliance will be obtained for each violation, and gives the opportunity for a hearing; (2) a civil penalty is a fine of not more than $100,000 per day of violation; and (3) an order instructs a plant to take or refrain from a certain action.

In 1997, NRC had five severity levels of violations, from level I, the most severe, to level IV, the least. A notice of violation was generally issued for levels IV and V violations, which the licensee reported and corrected. Civil penalties were generally imposed on levels I, II, and III violations, but could also be assessed for a level IV violation when a similar violation had been repeated.

Confirmatory action letters were intended to focus management's attention on the need for remedial action. Orders could be used to suspend operations, to remove individuals from positions, to require third-party audits, and to require changes in procedures.

Vollmer states that as performance of new plants increased and NRC expectations grew, the older utilities were left without a firm basis to measure their regulatory performance except SALP reports, individual inspections, and meetings with NRC. Vollmer states that these measures did not indicate to NPPD that the Plant was failing to keep pace with rising NRC expectations. NRC and the Institute of Nuclear Power Operations were sending signals that its performance was good, and there was nothing criterial for NPPD management to have judged otherwise.

He noted that NPPD management was aware of the rising expectation, but the question was how much and how fast to change. Between 1986 and 1994, when the Plant received a trending letter, 32 nuclear units were placed on the watch list, and their average stay was 30 months. The Plant's SALP rating was a 1 until 1993, when an incident involving a strainer was followed by the SALP rating going down to a 3. NRC's trending letter indicated the Plant's performance was declining, but the Plant was not placed on a watch list. He opined that while the

Plant did not keep pace with rising expectations as compared to other plants in a similar position, it was able to recover quickly. He stated that experience has shown that performance cannot be turned around overnight.

Vollmer analyzed the SALP report and other indicators and opined:

> An analysis of the contents of these SALP reports covering the period from early 1988 to early 1993 clearly demonstrates that NPPD had responsibly met its regulatory requirements; Cooper [the Plant] was being held to rising expectations; rising expectations were being accommodated; and Cooper was not a "problem plant[.]"

Vollmer also related his inspection of NRC inspection reports and other NRC action and opined that "while the NRC perceived weaknesses in NPPD's regulatory performance, they still retained confidence in NPPD management's ability to solve any problems that had been identified."

He opined that in 1992 and earlier, the reports gave no indication of difficulty. He opined that "[t]he overall regulatory performance of Cooper [the Plant] and its management in 1992 can only be characterized as fully meeting or exceeding expectations."

The Plant received two level III notices of violations on March 30, 1993, and three on October 12, 1993, with penalties totaling $400,000. NPPD initiated a corrective action program. In the October 12 cover letter to the notice of violation, NRC said:

> " 'NRC recognizes that NPPD has initiated broad corrective action in an attempt to resolve these weaknesses in its corrective action programs. However, the NRC also recognizes that the resolution of such fundamental weaknesses will require a substantial effort for an extended period of time and that NPPD may have to take additional steps as it continues to obtain information from the efforts already underway.' "

The operational safety team report in November 1993 gave NPPD the signal that its performance was good.

Vollmer opined that when operational issues did arise in 1993, NPPD's responses were prompt and aggressive, which he

felt was supported by NRC's not putting the Plant on the watch list. The January 25, 1994, trending letter indicated NRC was concerned that the Plant's performance might be declining. Vollmer attended a senior management meeting held January 11 through 13, 1994, at which the Plant was discussed, but it was not placed on the watch list. Vollmer denied it was near being so placed, as one expert witness for LES had opined. Vollmer stated his sense of the meeting was that they decided to wait and see.

At about the same time, Vollmer made a study for NRC, and he concluded that utilities were not always aware of NRC expectations and that they would take extensive action if advised of declining performance. His recommendation was accepted by the NRC, and no plant which was advised about NRC expectations slipped so as to be placed on a watch list. Vollmer opined that NPPD was wisely proactive in having a "Diagnostic Self Assessment" (DSA) inspection conducted. He stated that NPPD had initiated changes before the trending letter was issued, but he opined that such changes take time to implement and to take effect or show results.

After receipt of the trending letter, NPPD initiated plans, intending to integrate the improvement activities already underway. Vollmer opined that before these plans could be implemented, the "diesel generator" issue arose. The plant was shut down on May 25, 1994. Additional issues arose, and a confirmatory action letter described various issues that had to be resolved before restart. But NRC did not require NPPD to obtain specific NRC approval before restart. He opined that the issuance of the confirmatory action letter was neither surprising nor unusual.

On June 21, 1994, the trending letter was updated. Vollmer opined that the letter indicated NRC was of the opinion that NPPD "had taken hold of and was in the process of resolving the NRC's issues." He reiterated that changes take time.

In the summer of 1994, NPPD determined to have the DSA inspection to gain internal acceptance of problems and a more effective resolution of them. The DSA report was expected to be a highly critical report. Vollmer explained why he felt the DSA report approach was the correct one. He opined that the DSA

report would provide a frank and comprehensive overall assessment and would send a message that incremental improvements were not going to be enough. He opined that the report's root causes did not investigate whether management's actions were satisfactory.

He stated that NPPD immediately acted upon the DSA report's findings with a three-phase plan that he opined made it possible to successfully restart in 1995. He stated he was not surprised that it took almost 2 years for NPPD to develop and implement effective strategies for achieving significant regulatory performance improvement. He opined that NPPD's regulatory performance was not improving at the rate at which NRC standards were escalating. His conclusion was that "NPPD has been very responsive in meeting regulatory requirements and, further, has been responsive in meeting the NRC's non-codified expectations as evidenced by Cooper's generally good performance during a period of rapidly rising regulatory standards." He continued and opined (1) that NPPD had been responsive and responsible in meeting its regulatory requirements; (2) that the Plant had not been a " 'problem plant' " as demonstrated by accepted indicators of regulatory performance; (3) that rising expectations of NRC, not communicated by NRC or encoded in the regulations, became the yardstick by which the Plant was measured, which resulted in a perceived decline relative to expectations; (4) that NPPD management was effective and proactive in dealing with NRC's identified issues and findings; (5) that NPPD management took a decisive and timely course to improve the Plant's regulatory performance; and (6) that NPPD management's performance at the Plant was a prudent balance between safety needs, rising expectations, and efficient power production.

M. Monika Eldridge, a mechanical engineer with 14 years' experience in the nuclear power field, made a study and a report purporting to measure the Plant's operation compared to other plants in the United States in respect to 16 measurements of performance, such as the DSA report, NRC's SALP numbers, the number and amount of NRC civil penalties, the number of safety system failures, the number of water system events, and the number of residual heat removal events, et cetera. She did so by

determining the percentile standing of the Plant in each category. Eldridge concluded this method "indicates a significant programmatic breakdown in" the Plant's operating experience review as compared to other plants.

*Evidence of Mismanagement.*

The evidence relevant to mismanagement is so voluminous that the parties had trouble summarizing it in their briefs, and we find it difficult to summarize it so that the issues are presented. We will attempt to summarize enough so that the reader is aware of the character of the evidence. The following is intended to be a summary of the evidence which establishes that the Plant was shut down in 1994 and that the 1993 shutdown was extended as a result of NPPD's mismanagement. The fact that the statements were made or the action was taken as described in this summary is not disputed.

The deposition of Guy R. Horn, taken on October 21, 1996, was introduced. Horn was the senior vice president for energy for NPPD when his deposition was taken, but before that and at times significant to this action, he had been the Plant manager from 1986 to 1990 and then the nuclear power group manager for NPPD until 1993, when he became vice president. His testimony from the deposition will be interspersed with summaries of documents which are in evidence, although he was not questioned in regard to all of the documents.

Horn testified that until 1992, the Plant's performance appeared to be excellent by all indications, including feedback from NRC. Horn testified that NRC regulations changed, and NRC changed the enforcement of its regulation. After the "strainer issue" and conversations with NRC personnel, he and other managers were concerned that current Plant management would not respond quickly enough to change the level of performance necessary to satisfy NRC.

Horn admitted that the Plant's operation was poor in relation to " 'others' " in the industry, but maintained it was not as poor as compared to all. He agreed that management was the primary reason for performance problems and that the Plant's programs and processes needed to be upgraded to match the industry's new standards. He agreed with the DSA report and with the

"Special Evaluation Team" report, except for one aspect concerning performance improvement plans. Horn also admitted that NPPD's staff did not aggressively react to resolve a low voltage battery operability problem.

In the fall of 1992, NPPD retained Enercon Services, Inc., to do a management assessment. Enercon prepared a 27-page performance assessment and an 11-page assessment program plan. The performance assessment contains such statements as, "[a]lthough overall plant performance at CNS [the Plant] is satisfactory, the District's Nuclear Power Group (NPG) and CNS senior management recently began to perceive that desired performance trends at CNS are not proceeding at a uniform rate through all departments." It included a "problem statement," which states: " '*Goals and objectives are not well understood and organizational accountability for achieving them is not strongly promoted.'* " (Emphasis in original.)

On March 30, 1993, NRC sent NPPD a notice of violation and assessed NPPD a $200,000 penalty for violations referred to in that notice. The cover letter accompanying the notice refers to an inspection conducted February 1 through 9, 1993. The cover letter states that in an August 1992 inspection, NRC found strainers in the "suction piping for the CNS [Plant] Core Spray System," which should have been removed after startup testing and were not; that it had issued a notice of violation in November 1992 and that in response, NPPD cited the root causes as programmatic weakness to its response to a certain NRC information notice and the failure of the preoperational procedure to include a step to remove the strainers; and that a check had been made to locate other strainers and that none were found. However, on January 27, 1993, an additional strainer had been found while changing a pump, and later radiography determined additional strainers were located in each of three systems. The notice of violation indicates that NPPD's reply in December 1992 was inaccurate and that NPPD had multiple opportunities to act on information indicating the existence of the strainers, but failed to do so. It noted the regulation requires a licensee to have measures in place which ensure that deviations and nonconformance are promptly identified and corrected, and NPPD's did not, and it also concluded NPPD had

multiple indications. The notice recommended that NPPD focus on the program itself to see if a more fundamental weakness might exist. The notice indicates that the cause was a failure in responsibility. A $200,000 penalty was assessed to "emphasize NPPD's need to improve its problem identification and resolution programs, as well as its need to assure [sic] that information provided to the NRC is complete and accurate[.]"

The evidence contains a letter dated April 29, 1993, from Horn to NRC, responding to the notice of violation. The format of this response, and all other responses by NPPD to notices of violations, was to state a summary of the alleged violation, to admit or deny it (always admitted), to state the reasons for the violation, and to state the steps which had been taken and would be taken to correct the violation. Violation A consisted of NPPD's giving an inaccurate and incomplete response to NRC concerning the above-mentioned "strainer," and violation B concerned the existence of the temporary and improper strainers. The response ended with a plea asking NRC not to impose the full $200,000 penalty in view of NPPD's past compliance and its past record. The penalty was not changed.

As a result of inspections during the 1993 planned outage, NRC ordered that the Plant could not be restarted until deficiencies were assessed and corrected. NPPD admitted the violations.

In a "Post Outage Critique Item Form," dated August 6, 1993, in the handwriting of Horn, Horn stated that "the 1993 outage schedule was severely impacted (56 to approx. 140 days) by emergent work . . . surveillance testing failures, wind conditions, lack of spare parts and unanticipated design changes. A delay of this magnitude is outside current industry standards and expectations." Horn goes on to write: "A self assessment of outage planning, preparation and implementation be performed utilizing a industry expert in this area."

Horn was questioned on the minutes of an employees committee meeting on January 17, 1994, wherein Horn was quoted as stating that "the extension of the outage cost approximately $9M beyond the budgeted O&M amount." He admitted he made the statement. He also stated that management was doing an assessment of the causes of extended outages but that "our

greatest immediate concern is addressing those issues recently targeted by the NRC."

On October 12, 1993, NRC sent a formal notice of violation with an assessment of $200,000 penalties referencing inspections conducted on March 29 through April 2, and from May 3 through 7, and a subsequent enforcement conference. The letter indicated, with reference to the Code of Federal Regulations, that the penalties were for several items that collectively indicated a breakdown of NPPD's corrective action program, $75,000; a violation involving inoperable containment/oxygen analyzers, $75,000; and a violation involving failure to include water and reactor equipment cooling systems in required inservice inspection programs, $50,000. The letter noted that NPPD characterized the violations as having minimum safety significance, but the notice opined that taken as a whole, they indicated a breakdown in NPPD's corrective action program which had the potential to affect reliability of many safety-related systems, that failure to maintain the analyzers in an operable condition was an example where an important component might not have proved reliable when needed, and that failure to conduct pressure testing of said cooling systems placed in question the long-term reliability of these systems.

In view of the fact that this matter is an appeal of the granting of a summary judgment where the evidence and inference are to be taken in a light most favorable to NPPD, we note that NRC said in the notice of violation on October 12, 1993: "The NRC acknowledges that NPPD's long-term corrective actions for EA 93-030 could not have prevented the violations cited in section I.A of the enclosed Notice of Violation and Proposed Imposition of Civil Penalties, most of which occurred prior to the date of NPPD's written response." The notice also noted that NPPD recognized the weaknesses and had initiated corrective action, but "such fundamental weaknesses will require a substantial effort for an extended period of time."

A formal reply was sent to NRC by Horn on November 12, 1993. Horn stated: "Event investigations necessitated District management's reevaluation of perceptions, expectations, and performance. It became apparent that changes in management and employee attitudes and organizational culture were neces-

sary." Horn stated that NPPD had instituted a corrective action program and a "Nuclear Power Group Strategic Plan For Performance Improvement" and that NPPD management had directed a comprehensive "Organizational and Programmatic Assessment." In summary, the letter admitted that management must be improved and stated what NPPD intended to do about it, but it was couched in generalities we find difficult to understand. The accompanying formal reply admitted the charged violations and explained what had been and would be done to avoid similar incidents in the future. The response alleged all violations had been completed with the exception of one which could not be completed until October 1994.

The Plant shut down voluntarily on May 25, 1994, until February 21, 1995. We do not find a clear explanation of who decided to shut down the Plant. We find no clear evidence that NRC ordered it shut down. It appears to have been a voluntary shutdown, in the sense that no order was issued by NRC, but it is clear it was shut down because of the multiple issues that were being raised by NRC. It might have been shut down voluntarily after a discussion with NRC officials in order to avoid the inevitable. There is indication that NPPD shut it down so Plant management could be reorganized and problems efficiently eliminated.

A confirmatory action letter from NRC to NPPD dated May 27, 1994, referred to a verbal discussion with Horn concerning NPPD's noncompliance in certain respects and stated that it was the writer's understanding that NPPD would not restart the facility until it took certain corrective action. The letter stated that pursuant to a conversation with Horn, NPPD should take the following actions summarized: (1) test certain specified electrical equipment in its "as is" condition, (2) define the design basis for testing criteria for the control room turbine building ventilating systems, (3) provide NRC with a letter discussing the root causes for defeating the under voltage trip function in the "Motor Control Center N supply breaker." The letter went on for another page, specifying the details of tests to be performed and requesting the results to be sent to NRC. It then demanded NPPD notify NRC if it could not comply with it and warned that the failure to take the action might result in enforcement action.

The record contains a letter dated June 21, 1994, from NRC to the president of NPPD, which in summary stated that the recent trend in performance at the Plant raised sufficient concerns that a meeting with the president was considered important, and after referring to other meetings between NRC and Plant personnel, that based on the discussions, the actions taken and planned, including management changes, "have the potential to address the concerns regarding the trends in plant performance [and] planned actions should be reviewed to ensure that they address any additional areas of concern."

The record contains a confirmatory action letter dated July 1, 1994, which directed some of the same tests as directed by the May 27 confirmatory action letter, plus an additional one, and stated the Plant will not be restarted until Horn attended a meeting at NRC headquarters to discuss the issues upon which testing was ordered and provided NRC with a letter discussing the test and results quite similar to that contained in a similar paragraph described in the previous confirmatory action letter.

A confirmatory action letter dated August 2, 1994, stated that "two significant, self-identifying hardware failures have occurred that affected the operability of safety-related systems. One instance involved the failure of an SMB switch and the other instance involved a through-wall leak in the reactor equipment cooling system piping." The letter stated that it was NRC's understanding that the failure had occurred at the Plant and other facilities and that it appeared that the Plant staff's failure to implement appropriate action based upon its own experience, industry experience, and NRC information was a contributing factor to the failure of the equipment. It stated that in its view, the incidents were avoidable and that "our confidence in the adequacy of the reviews performed by your staff is lacking." The letter went on to state that Horn should supplement the response to an April 1994 confirmatory action letter to describe the basis of any assurance an adequate review had been conducted to support plant restart.

A notice of violation dated December 12, 1994, specified the violations summarized below. This notice referred to an inspection conducted from May 23 to August 12, 1994. There was a response from Horn to NRC dated January 18, 1995, replying to

this notice. Horn's response stated that violation A-1 referred to a failure from January 18, 1974, to May 27, 1994, of not maintaining " 'primary containment integrity' " when required by regulations. Violation A-2 was the failure to ensure that all testing was identified and performed in accordance with written standards. Violation A-3 was the failure to assure the design basis was translated into quality standards. Violation B-1 concerned the condition of auxiliary electrical equipment and apparently the failure to maintain or test this equipment. The violation indicated that when the reactor was critical, the equipment would not work. Violation B-2 concerned failure to have test programs to ensure all systems perform satisfactory. Violation C-1 concerned the control room emergency filtering system, its proper construction and testing, and the proper reporting of its condition. Violation C-2 concerned the failure to establish proper test programs to demonstrate that all systems worked as required. In NPPD's response, it admitted the violations and explained them.

In Horn's deposition, he was questioned about a January 18, 1995, letter he wrote to NRC transmitting NPPD's reply to the NRC notice of violation dated December 12, 1994. In that letter, Horn stated that "each of the 'problems' and violations had common causes relating to NPG management and culture." He also stated that NPPD realized that these conditions should have been recognized and corrected long ago.

The "site manager" at the plant was replaced in the fall of 1993, and several other managers at the Plant were replaced in 1994. When asked why it took so long to replace the plant management, Horn testified that he had hired a reputable firm to recruit replacements, but it took time, and he did not want to change all managers at the same time, and that he intended to change the "culture" of the Plant. Ultimately, he changed the entire senior management staff.

The record contains the DSA report on the inspection assessment arranged and paid for by NPPD. The inspection was made between July 25 and August 19, 1994, by a team headed by Ralph E. Beedle, a former nuclear utility senior executive, and 14 technical advisors. This report is approximately 2 inches thick and was submitted on September 1, 1994. It was critical of

the Plant's management. In LES' brief, it quotes from the report that NPPD had " 'failed to keep up with improving industry standards,' " (emphasis omitted) brief for appellee at 16, but there are many more statements in that report which are critical of management of the Plant. The following are some of the lead sentences in Beedle's cover letter to the report: "Corporate and station management have not established or encouraged high standards for personnel[;]" "[w]eaknesses in long-range planning and scheduling have contributed to the station's inability to address long-term problems[;]" "[i]ndependent oversight has been ineffective[;]" and "[t]he SRAB and SORC have failed to aggressively challenge performance weaknesses[.]" The cover letter went on to cite functional matters that were improperly conducted over the previous years, but it did not state that any outage was due to NPPD practices.

In a letter dated September 16, 1994, R.W. Watkins, president and chief executive officer of NPPD, stated that the NPPD board of directors agreed with the concerns presented by the report. The letter also stated that the board was not pleased with the Plant's performance and that the report gave them a better understanding of the nature of the Plant's problems. Watkins also stated that the report presented an accurate assessment of the Plant's operations.

On January 27, 1995, J.H. Mueller, site manager, wrote a memorandum to Horn. Mueller recognized that the DSA report identified the root causes related to "management's lack of capability." He also summarizes similar cases identified by the special evaluation team and still other causes by management related to "cultural beliefs and organizational skills." He stated in the memorandum:

Specifically, the fundamental organizational beliefs did not recognize that:

• The station's performance was poor with respect to others in the industry and that significant change was needed to improve[.]

• Management, not the NRC, was the reason for these performance problems, and

• The old ways of doing business were not effective and had to be improved[.]

The memorandum goes on for four more pages, specifying in what must be the language of the management trade, describing what was then being done to improve Plant efficiency.

Much, if not all, of the individual acts and admissions summarized above were established to the point that there is no genuine dispute about them. There are many others of similar import. NPPD admitted many of them in its answer, and in any case, the reports are in evidence and not disputed. The fact that the findings by inspectors that NPPD personnel failed to perform required tests, or erroneously failed to report certain things, and that certain systems did not work when they should have worked and that management is responsible for these failures, as above summarized, is not genuinely disputed.

The issue is whether from these admitted facts the deduction must be made that the 1994 shutdown was caused by NPPD mismanagement, as the trial court's granting of LES' partial summary judgment effectively ruled. In addition, the ruling held that these facts required the deduction that the 1993 outage was extended by NPPD mismanagement, but not the length of that extension. We note that we can find no indication in the court's ruling, or its instructions to the jury, of a standard by which the jury was to determine the amount of outage time that NPPD was liable for as a result of the 1993 outage. Similarly, the partial summary judgment found the penalties or fines NPPD paid were necessarily the result of mismanagement. We note that the $700,000 penalty is a total of several penalties which the evidence shows were assessed for several different acts, or failure to act, at different times. The partial summary judgment determined that a deduction must be made from the evidence that all of the several penalties were caused by mismanagement and were the result of NPPD not operating and maintaining the Plant "in an efficient and economical manner consistent with good business and utility operating practices." No one points to these fines as having been assessed for violating specific NRC regulations.

Vollmer's report is to the effect that the plant was operating in accordance with NRC regulations and expectations; that the NRC raised the expectations; and that it did not communicate to NPPD the extent it raised its expectations until, by the nature of

the management of such a plant, a utility could not reorganize to meet these rising expectations as quickly as NRC enforcement required. It is easy to understand that a total replacement of all management of a large plant cannot be accomplished overnight. The time necessary to make needed changes could not be determined without issues of facts. In effect, Vollmer opined that NPPD efficiently and reasonably took steps to meet the increased NRC standards and expectations as quickly as possible. If NPPD did not meet the known standards and could not reasonably have known about the increase in time to prevent the outages and penalties, then its mismanagement could not have been the cause of the outages and penalties.

We are left with the question of whether or not all of the various admissions of individual actions which were made establish as a matter of law that NPPD was guilty of mismanagement that resulted in one outage, the extension of another, and the penalties.

> Where the facts alleged are not in dispute but are susceptible of different and conflicting inferences, or where the ultimate inferences to be drawn from those facts are not certain, a summary judgment is not a proper disposition. The benefit of any doubt resulting from such varied inferences goes to the party resisting the motion. See, *Stolte v. Blackstone*, 213 Neb. 113, 328 N.W.2d 462 (1982); *McVey v. Discher*, 122 Ill. App. 2d 408, 259 N.E.2d 300 (1970).

*Regnev, Inc. v. Shasta Beverages*, 215 Neb. 230, 233, 337 N.W.2d 783, 785 (1983).

Where reasonable minds may differ as to whether an inference supporting the ultimate conclusion can be drawn, summary judgment should not be granted. *Blue v. Champion International Corp.*, 204 Neb. 781, 285 N.W.2d 511 (1979); *Pfeifer v. Pfeifer*, 195 Neb. 369, 238 N.W.2d 451 (1976). A summary judgment is not appropriate, even where there are no conflicting evidentiary facts, if the ultimate inference to be drawn from these facts is not clear. *Metro. Tech. Community College v. South Omaha Industrial Park*, 207 Neb. 472, 299 N.W.2d 535 (1980). If reasonable minds might draw different conclusions from the facts thus resolved, the issues are for the jury. *Melick v. Schmidt*, 251 Neb. 372, 557 N.W.2d 645 (1997).

In *Schade v. County of Cheyenne*, 254 Neb. 228, 575 N.W.2d 622 (1998), on a petition for further review, the appellant argued that this court had improperly inferred in a memorandum opinion that a maintenance worker must have failed to look and then see water on the floor because he was in the area approximately 2 minutes before the fall occurred and saw no water on the floor. The appellee contended this inference improperly assumed water was, in fact, on the floor at that time and was the cause of the fall. The Nebraska Supreme Court in *Schade* disagreed, saying:

> In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Battle Creek State Bank v. Preusker*, 253 Neb. 502, 571 N.W.2d 294 (1997). Where reasonable minds differ as to whether an inference supporting the ultimate conclusion can be drawn, summary judgment should not be granted. *Blue v. Champion International Corp.*, 204 Neb. 781, 285 N.W.2d 511 (1979). In fact, summary judgment is not appropriate even where there are no conflicting evidentiary facts if the ultimate inferences to be drawn from those facts are not clear. *Fisher v. Stuckey*, 201 Neb. 439, 267 N.W.2d 768 (1978). Where two reasonably logical inferences are available, as in the case at bar, appellate courts are obligated to draw the inference most favorable to the nonmoving party.

254 Neb. at 231-32, 575 N.W.2d at 624-25.

The *Schade* court stated that not allowing the inference to the nonmovant undermines the summary judgment standard of review and disallows the party a right to proceed to trial. It observed that a summary judgment is an extreme remedy because summary judgment may dispose of a crucial question or litigation and thereby deny a trial to the party against whom the motion for summary judgment is directed and that overruling a motion for summary judgment effectuates no real harm to the moving party.

We therefore conclude that the trial court should not have granted the partial summary judgment. We reverse that order

and the jury verdict which necessarily depended upon it and reverse the cause for a jury trial consistent with this opinion. We note, however, that in submitting an issue of the amount of the extension of the 1993 outage, we find on this record no instruction to the jury by which it could determine how much if any was the result of mismanagement.

REVERSED AND REMANDED WITH DIRECTIONS.